466 So.2d 833 (1984)
BLUE CROSS & Blue Shield of Mississippi, Inc., et al.
v.
William T. CAMPBELL.
No. 54744.
Supreme Court of Mississippi.
December 19, 1984.
Rehearing Denied April 10, 1985.
Warren C. Dorsey, Jr., Jackson, for appellant.
Leslie D. King, Greenville, for appellee.
En Banc.
HAWKINS, Justice, for the Court:
Blue Cross & Blue Shield of Mississippi, Inc., appeals from a judgment of the Circuit Court of Washington County in favor of William T. Campbell for $10,000 damages beyond his policy coverage with Blue Cross.
Finding no conduct by Blue Cross which would justify a claim for damages in excess *834 of the policy provisions, we reverse and render judgment for Blue Cross.

FACTS
Campbell made application on October 2, 1980, for a non-group insurance policy with Blue Cross. In answer to the question of whether he had ever been treated for, or had known indication for (among other things) "alcoholism," he marked "No." He was likewise asked about "ulcer" and the answer was "No."
The face of the application signed by Campbell in bold face type states:
I agree, that in the event illness, disease or infirmity for which I or my dependents, if any, receive care or treatment during the first twelve months after the effective date of the contract, has resulted from causes existing prior to the effective date of the contract, then no benefits shall be provided during or on account of such illness, disease or infirmity.
On October 16, 1980, Blue Cross issued a non-group policy to Campbell. It contained an exclusion for, or as a result of, any ailment or disease or physical condition existing at or before the effective date of the contract. The contract further provided that after the policy had been in force twelve months this exclusion would not apply, except for a congenital defect.
On December 3, 1980, six weeks later, Campbell appeared at the Emergency Room of Delta Medical Center in Greenville, a local hospital (Delta Medical). He was discharged December 19, 1980.
Delta Medical in due course sent a claim to Blue Cross for Campbell's hospitalization, showing the total hospital charges to be $8,210.87. The claim form gave as Campbell's diagnosis: "acute alcoholic pancreatitis."
Of the total hospital charge of $8,210.87 for this first hospitalization in December, 1980, $4,555.75 was for drugs.
The claim form also contained the following statement signed by Campbell:
AUTHORIZATION TO PAY INSURANCE BENEFITS:
I hereby authorize payment directly to the above-named hospital of the Hospital Benefits, herein specified and otherwise payable to me but not to exceed the hospital's regular charges for this period of hospitalization. I understand that I am financially responsible to the hospital for charges not covered by this authorization.
The medical staff of Blue Cross questioned this claim (hereinafter detailed), and on February 19, 1981, sent a form letter to the medical records librarian of Delta Medical requesting Campbell's history and physical, and Discharge Summary. The final paragraph of this form letter states the following:
Payment of this claim will be delayed pending receipt and review of the above information. This information must be received within 20 days from the date of this request in order to avoid a denial due to lack of medical information. Please attach a copy of this request to the information to insure prompt handling.
Your assistance and cooperation are appreciated.
This form letter shows that a copy was mailed to Campbell at his Greenville address.
Apparently, Blue Cross received no reply from Delta Medical, and again on March 2, 1981, sent the same form letter to Delta Medical.
Following receipt of this information Delta Medical sent the requested hospital information. The following are sentences extracted from Campbell's Discharge Summary:
... he stated that he had been drinking alcohol excessively on the week end and after that for an extended period of time.
* * * * * *
His past history further revealed that he had been treated in the past due to *835 duodenal ulcer and he was a known alcohol abuser.
* * * * * *
After the 5th hospital day the patient showed signs of alcohol withdrawal, became disoriented, combative. This was managed with Haldol 5 mgs. given every 4 hours unless the patient was over sedated.
The following sentences are extracted from Campbell's History:
HPI (History of Present Illness):
This patient was brought to the Emergency Room service with abdominal pain, nausea and vomiting of one day's duration. He denied any diarrhea and stated that he had been drinking alcohol too much on the week end and every week end for quite an extended period of time.
* * * * * *
PH (Past History):
He has been treated in the past due to duodenal ulcer... . He states that he has had a very heavy drinking habit, especially on the week ends for the past several years. [Emphasis added]
From Campbell's Physical Examination the following diagnosis is quoted:
DIAGNOSIS:
Acute pancreatitis possibly due to alcoholism.
Active duodenal ulcer.
General debility due to the above.[1]
All of the above hospital records are signed by J.B. Yeldell, M.D.
Based on the hospital records transmitted to them, Blue Cross denied the claim.
On March 26, 1981, Campbell signed a Discharge Payment Agreement with Delta Medical. The agreement recited his hospitalization from December 3 to December 19, 1980, and that the total bill was $8,180.87. In the agreement Campbell promised to pay this account at the rate of $50 a month, with no provision for interest, beginning May 1, 1981. The agreement does provide that in the event of a default Delta Medical could charge a collection fee of 15 percent upon the amount due.
Campbell was again hospitalized in Delta Medical on April 28, 1981, and discharged May 11, 1981. The claim to Blue Cross dated May 13, 1981, showed charges for hospitalization to be $2,823.28. The diagnosis on this claim states:
DIAGNOSIS:
Acute Pancreatitis along with acute gastritis UTI (urinary tract infection), etiology undetermined  possible duodenal ulcer, active.
This form, also signed by Campbell, likewise authorizes the payment of all benefits directly to the hospital. Also, across the face of the statement for hospital transmitted to Blue Cross there is stamped the following: "INSURANCE BENEFITS ASSIGNED TO DELTA MEDICAL CENTER." The History signed by Dr. Yeldell in this second hospitalization states that the past history revealed Campbell "has been treated in the past due to pancreatitis, gastritis, duodenitis and peptic ulcer disease," and because of this he was readmitted for further evaluation and treatment. The history showed that he had been treated in December for pancreatitis, and a duodenal ulcer.
In the Discharge Summary, the doctor stated: "The ulcer healing was deemed to be satisfactory. He was advised to remain on a convalescent diet and will be re-evaluated in my office in one week." The Discharge Summary also stated that Campbell had a small active duodenal ulcer.
The Physical Examination of Campbell gave the following diagnosis:
DIAGNOSIS:

*836 Acute pancreatitis along with acute gastritis.
Urinary tract infection, etiology undetermined.
Possible duodenal ulcer active.
Again, the Physical Examination, history and Discharge Summary are all signed by Dr. Yeldell.
On May 21, 1981, Blue Cross received from Delta Medical a copy of the original claim submitted for the December hospitalization. It is the same as the original transmitted, except a barely discernible line is drawn through, or at the bottom of "Acute alcoholic," and further over on the form there is typed: "Acute Pancreatitis," and there is printed in someone's handwriting the following statement across the face of this copy:
 CORRECTIVE BILLING
 Wrong diagnosis
 Submitted
 ____________________
 Al
Because there had been no correction of the hospital records, Blue Cross still denied the claim. Campbell was hospitalized again on June 16, 1981, to June 22, 1981. Again Delta Medical sent a claim form to Blue Cross with the diagnosis of "Acute Pancreatitis and small duodenal ulcer." This claim form also contains the signed authorization to pay all benefits to Delta Medical. Also, there is stamped on the face of the statement: "INSURANCE BENEFITS ASSIGNED TO DELTA MEDICAL CENTER." The total hospital charges were $1,514.50.
The final diagnosis for this hospitalization gave "acute pancreatitis, Small Duodenal Ulcer."
The secondary diagnosis or complications gave "alcohol Abuse."
Dr. Yeldell's history stated in part: "he has been treated in the past due to the same condition. He also has been treated due to duodenal ulcer. He has been a known alcohol abuser and has been hospitalized on several occasions during the last year."
The Physical Examination gave a diagnosis of "acute pancreatitis, with a possible active duodenal ulcer." These are signed by Dr. Yeldell.
In July, 1981, Campbell employed a Greenville attorney, Leslie D. King, who wrote a letter to Blue Cross dated July 31, 1981, requesting reconsideration of, and payment of the claim. King's letter enclosed a handwritten note from Dr. Yeldell stating that Campbell's was not a pre-existing condition. This letter with the doctor's statement was received by Blue Cross on August 7, 1981. Blue Cross responded to King's letter by letter dated August 27, 1981, the following:
Dear Mr. King:
In response to your correspondence, we have again reviewed the medical records pertaining to Mr. Campbell's admissions on December 3, 1980, April 28, 1981, and June 16, 1981, to Delta Medical Center. Your correspondence included a letter from Dr. Yeldell. Based on the information supplied by Dr. Yeldell, it has been determined that benefits can be provided for these confinements. Therefore, payment will be made toward the previously denied charges in the near future.
Should there be any questions, please do not hesitate to contact us.
S/Ms. Linda Guenin, R.N. Medical Review Department
The letter to King shows that copies were mailed to Campbell, Dr. Yeldell and Delta Medical.
On August 28, 1981, a letter was written to Blue Cross on King's letterhead, but signed by Campbell as follows:
Blue Cross-Blue Shield Insurance Company
 P.O. Box 1043
 Jackson, Miss. 39205
ATTENTION: Claims Department
Gentlemen:
This letter comes to direct the check for claims of December, 1980, and April and June, 1981, be forwarded to my attorney, Leslie D. King in a check payable to the two of us.
*837
 Sincerely,
 (Signed) William T. Campbell
 WILLIAM T. CAMPBELL
 XXX-XX-XXXX
On August 28 King wrote Mrs. Guenin the following letter:
This will acknowledge receipt of your letter under date of August 27, 1981, indicating a decision to pay towards the previously-denied charges. While my client is happy Blue Cross is now seeking to honor its contractual obligation, there are two points that must be clarified. First the check should be forwarded to my office and made payable to Mr. Campbell and my office jointly. The second and most difficult is the amount of the check. Because Blue Cross breached its obligation, my client has been forced incurr [sic] additional expenses in enforcement of this contract.
The additional expenses incurred by Mr. Campbell equal to 1/3 of the covered medical expenses. My calculations place this total figure at $13,352.97.
(Signed) Leslie D. King
Sally McDavid, General Counsel for Blue Cross responded with the following letter to King, dated September 1, 1981:
Dear Mr. King:
Your letter of August 28, 1981, to Mrs. Linda Guenin has been forwarded to me for reply.
As indicated in an earlier letter from Mrs. Guenin, the company has determined to pay contract benefits for services rendered Mr. Campbell which had been previously denied on the basis that the condition for which services were rendered pre-existed the contract effective October 15, 1980.
Your calculation of total charges in your July letter, which enclosed the memo from Dr. Yeldell, was not complete. Attached hereto is a full summation of the charges and the payment due toward those charges in accordance with the contract.
Mr. Campbell's contract calls for an annual $100 deductible, with the balance of covered charges paid at 80 percent, except that hospital room and board charges are paid at 100 percent of the semi-private room rate.
According to claims we have received, the total charges for services rendered to Mr. Campbell are $13,028.65. Payment due under the contract for those services totals $10,574.92.
Our original denial of benefits was based on medical records. The March 26, 1981, memo of Dr. Yeldell, included in your July 31, 1981, letter, had not been presented to our company before, and we were not aware of his position until that time.
The full benefits available under Mr. Campbell's contract, as set out above, are enclosed in a check made payable to Mr. Campbell and to you jointly. We do not make payments except for contract benefits.
 Sincerely,
 S/Sally McDavid
Blue Cross's check payable to Campbell and to King in the amount of $10,574.92, dated September 2, 1981, was endorsed and cashed.[2]
From the proceeds of the check attorney King received $3,524.96, Campbell paid the hospital $3,000.00, a doctor bill of something less than $500.00, and kept the rest of the proceeds.[3]
Campbell had no written contract with King. He testified: "I didn't sign any kind of agreement. I hired him as my attorney to try and recover this bill Blue Cross wouldn't pay."
*838 Campbell filed suit on October 5, 1981, and on July 27, 1982, filed an amended Declaration.
When trial commenced on November 19, 1982, Campbell's amended complaint asked punitive damages in the amount of $100,000 and actual damages in the amount of $25,000, all predicated on the wrongful refusal of Blue Cross to pay his claim.
The witnesses testifying for Campbell were: Campbell, Dr. Yeldell, and Charlene Oltremari Putnam, an insurance clerk with Delta Medical. Blue Cross offered two witnesses in defense, Patsy Cruz and Sally McDavid.
Cruz is a Registered Nurse employed in the Medical Review Department of Blue Cross. Her department, consisting of five registered nurses and a medical doctor, reviewed claims to determine, among other things, if they were for pre-existing conditions. She testified from the records in this case that Mrs. Dianne Flowers, the registered nurse in the department, first reviewed the claim for the December, 1980, hospitalization. She said that Mrs. Flowers screened the claim and determined that she needed to order the History, Physical and Discharge Summary from the hospital to provide an opinion as to whether or not the condition was pre-existing. She said that following receipt of these documents from Delta Medical, Mrs. Flowers was of the opinion that the condition was pre-existing. She said the physician Medical Director reviewed the records and agree with her that the condition was pre-existing and excluded under the policy. As to the December, 1980, hospitalization, Cruz testified:
The medical records indicated that the pancreatitis was possibly due to alcoholism. The records further documented that there had been a problem with drinking alcohol for quite a while. The records also indicated that he may have an ulcer on admission and the records showed that the patient indicated that he had had ulcers in the past. Based on Dr. Yeldell's records from the hospital it appeared that the pancreatitis was due to alcoholism, or related to alcoholism and, there was nothing in the records in the Discharge Summary that disputed this or denied this and all of our medical resources tell us that this is possible and our Medical Director was in agreement.
As to the corrected diagnosis on a claim form on May 21, 1981, Cruz testified that the Medical Review Department again reviewed the medical records, and they were the same as theretofore submitted, and the denial was maintained.
As to the April, 1981, hospitalization, Cruz testified that they again ordered the History, Physical Examination and Discharge Summary which revealed that Campbell had again been treated for pancreatitis and active duodenal ulcer, confirmed by x-ray. Based on the exclusion of the contract and the records from the first admission indicating it was pancreatitis, they again denied the claim. The people involved in denying the claim were Mrs. Flowers and Dr. Caldwell, their Medical Director.
She then testified that in August they received the letter from King, which had the statement in it from Dr. Yeldell indicating there was not a pre-existing condition. Prior to that time, Cruz testified they had not received any correspondence inquiry from anyone. She said that upon receipt of King's letter, she initiated a re-consideration; Nurse Flowers was no longer with the department. Cruz and Mrs. Guenin made a thorough review, and after reviewing the claim, Cruz authorized payment of all the claims. She said that Dr. Caldwell was out at the time because of illness.
On cross examination Cruz testified that while the medical books did not diagnose "alcoholic pancreatitis," and the medical diagnosis was "acute pancreatitis," their statistics told them that alcoholism is one of the causes, in fact, one of the primary causes of acute pancreatitis. She further testified that the medical records in the case diagnosed the condition as acute pancreatitis, and that these records also showed alcoholism for a protracted period.
*839 The only person connected with Delta Medical who testified in this case, as above noted, was Charlene Oltremari Putnam, the insurance clerk. She had been employed about one and one-half years. When the claim was submitted, she testified: "I got back a thing stating they were not going to pay for a pre-existing condition," and this was all she received. She said that the wrong diagnosis had been put on and she put the right diagnosis on the claim form. She said this claim and the two other claim forms for the other hospitalizations were all the documents that were submitted.
She testified on cross-examination that requests for follow-up records were not made through her, but through medical records. All she did was file insurance.
At the conclusion of the trial, the circuit judge granted Campbell five instructions on punitive damages. The jury made no award of punitive damages, however, finding in favor of Blue Cross on this issue.
The circuit judge also granted an instruction to the jury authorizing an award for actual damages, which reads as follows:
INSTRUCTION P 6
The Court instructs the jury that should you find from a preponderance of the evidence in this case that the Complainant, William T. Campbell has sustained actual damages as a proximate result of the actions of the Defendant, Blue Cross and Blue Shield of Mississippi, Inc., the Complainant, William T. Campbell, is entitled to a verdict in an amount which will reasonably compensate him for his loss. Such damages are called compensatory or actual damages and are awarded for the purpose of making the Complainant whole again insofar as a money verdict can accomplish that purpose.
In determining that award you may also consider any added sums of money the Complainant has been required to spend because of the Defendant's actions.
The jury returned the following verdict:
We, the jury, find for the Complainant in the amount of $10,000.00 Dollars actual damage.
Judgment was thereupon entered for Campbell for $10,000.

LAW
We find Blue Cross's assignment that there was no evidence to support the verdict of the jury and that it was entitled to judgment notwithstanding the verdict dispositive.
From this record, there was simply no issue of punitive damages or any other damages to be submitted to the jury, and the circuit judge erred in doing so.

NO BAD FAITH CASE
Blue Cross paid the full amount due under its policy prior to and without necessity of a suit being filed to collect it. The only question is whether under the facts of this case there was something about Blue Cross's conduct which justified a jury deciding the company owed additional damages. There was no such justification and Blue Cross was entitled to a directed verdict or a j.n.o.v. in the circuit court.
Blue Cross is an insurance company which pays hospital claims. When a Blue Cross policyholder is hospitalized, he ordinarily assigns his claim to the hospital, as Campbell did in this case. The hospital in the usual course of business submits the hospital claim. While it is no doubt true that failure on the part of Blue Cross to pay a just claim assigned to a hospital can cause an insured problems, and conceivably if carried to extremes, subject Blue Cross to punitive damages in a suit by the policyholder, it is initially a claim submitted by and due the hospital.
The primary business of Blue Cross is dealing with and paying hospital claims. These claims did not belong to Campbell, but to Delta Medical.[4] This was a case of one business institution dealing with another, and the medical records sent by Delta *840 Medical clearly indicate a condition preceding the policy's issuance.
There is no proof of Delta Medical doing any act, taking any step to satisfy Blue Cross's contention that Campbell had been hospitalized for a pre-existing condition, or that the claim was excluded under the terms of the policy.
Hornbook Medicine tells us alcohol is a significant factor in pancreatitis. Harrison's Principles of Internal Medicine, 9th Ed., states on p. 971: "Excessive use of alcohol is also a significant factor in the causation of pancreatitis."
Table 309-1 of this same authority, p. 1503, lists thirteen known major causes of acute pancreatitis, with numerous sub-head causes. We quote through the first.

CAUSES OF ACUTE PANCREATITIS
I. Alcohol ingestion (acute and chronic alcoholism)
Here was a claim for a man with a history of alcohol abuse. Even after his fifth day in the hospital he was disoriented and had to be strapped to the bed. He was "managed" by Haldol, a drug.
Campbell's drug bill on his first hospitalization was 55 percent of the total bill.
Why should Blue Cross be faulted for rejecting this claim? If a hospital wants to be paid for a claim in which its own records cast a serious doubt, the hospital should take the appropriate steps to see that Blue Cross is furnished with records or reputable medical opinion that the hospitalization was not for, or as a result of any ailment or disease or physical condition existing at or before the inception of a six-week-old insurance policy.
The uncontradicted testimony in this case is that the Blue Cross medical staff reviewed this claim and came to the conclusion, from the records submitted, this claim was excluded under the policy. Where is there any proof they acted arbitrarily or with caprice?
Indeed, it is clear from this record that this claim remains subject to serious doubt, at least a substantial portion of it. Valid argument would be made Blue Cross did its policyholders an injustice in not scrutinizing the claim more than it did before paying.
Strong argument is made about Dr. Yeldell's testimony at trial. It is not what Dr. Yeldell testified at trial, however, which is determinative of Blue Cross's bona fide questioning of Campbell's claim, but what Dr. Yeldell had written on the hospital medical records. Blue Cross had only the medical records before it when it denied the claim.
Even so, Dr. Yeldell at trial conceded that alcohol abuse is associated with fifty percent of all patients who have an attack of acute pancreatitis. Also, while Dr. Yeldell could say with complete honesty that the acute pancreatitis attack (for which Campbell was hospitalized) did not exist 24 hours prior to his admission, he obviously could not say the acute pancreatitis attack did not result "from causes existing prior to the effective date of the contract." While he did say the episodes which brought Campbell to the emergency room, the pain and suffering was of recent origin, he never said this acute attack was not as a "result of any ailment or disease or physical condition existing at or before" October 16, 1980. The quotes are the exclusionary language in the application and the policy, respectively.
Here we have claims submitted by the hospital which clearly suggest an etiology excluded by the insurance policy; Blue Cross denying the claims; and, the hospital taking no significant or realistic step to correct or clarify the information on the hospital records.
It was Campbell, not Delta Medical, who went to a lawyer, and the lawyer wrote a simple letter, not a demand or a threatening letter, but a simple letter in which he asked that the claim be reconsidered; and enclosed with this letter was a short handwritten note from Dr. Yeldell. Blue Cross reviewed the claim and in a matter of days wrote the attorney they were paying the claim, because Dr. Yeldell's statement satisfied them.
*841 As between Blue Cross and Delta Medical the trial record only reveals Oltremari (Al) sending in the insurance claims, and "correcting" one of the three. Dr. Yeldell testified about someone in medical records "bugging" him about the wrong diagnosis, and that he may have written something for medical records.
There is nothing in the trial record, however, which suggests that Delta Medical mailed any written statement from Dr. Yeldell correcting the reasons for Campbell's hospitalization.
The very first time Blue Cross received any information about this, it was from Campbell. The very first time Blue Cross heard from Campbell, they acknowledged they would pay the claim.[5]
In Standard Life Ins. Co. v. Veal, 354 So.2d 239 (Miss. 1974), we held that it was the absence of any arguable or legitimate reason to deny the insurance claim which breathed life into a cause of action for damages beyond the policy coverage. And in Reserve Life Ins. Co. v. McGee, 444 So.2d 803 (Miss. 1983), p. 809, we stated:
The trial court, of course, has the question as to whether or not as a matter of law the insurer had the right to deny payment of the actual money claimed under the policy.
In this case Blue Cross was acting well within its rights under the exclusionary provisions of Campbell's policy in denying the claims submitted by Delta Medical, and there was simply no "bad faith" issue to be presented to the jury.
We therefore conclude that when Blue Cross paid Campbell under the policy provisions he had no further cause of action against the company.
The judgment of the Circuit Court is therefore reversed and judgment is entered here for Blue Cross.
This Court will not hesitate condemning an insurance company refusing to pay a claim when there is no legal reason for it to deny the claim. On the other hand, we have an obligation to support any insurance company fulfilling its lawful responsibility of investigating any claim which is dubious. It is not the function of this Court to penalize honest and realistic evaluations of claims.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, J., concur.
ROBERTSON, DAN M. LEE, PRATHER and SULLIVAN, JJ., dissent.

ON PETITION FOR REHEARING
HAWKINS, Justice, for the Court.
The petition for rehearing is denied.
The following observations are to clarify what we stated in our majority holding in Reserve Life Insurance Co. v. McGee, 444 So.2d 803 (Miss. 1983).
Campbell argues that under the majority opinion in Reserve Life, whether an insurance carrier has been guilty of "bad faith" conduct is always a jury question under the familiar guideline of Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), that and nothing more. Therefore, he argues, we have deprived him of having a jury pass upon a disputed factual issue.
This argument ignores an additional requirement in all punitive damages cases, or any other case in which a plaintiff asks a court to impose special damages beyond conventional damages generally allowed a *842 successful plaintiff in a tort or breach of contract case. In a punitive damages case, it is the responsibility and function of the trial judge, after reviewing all the evidence, to first determine whether the facts of that particular case justify submitting to the jury the issue of such punitive or special damages. In such a case the trial court is not guided by the simple rules of Paymaster, considering only one side's evidence, but rather must consider all the evidence and determine if the defendant's conduct was such that the jury should be called upon in turn to decide the justification and amount of punitive damages, or some extraordinary damages.
Upon appeal, it is also the function of this Court to determine from all the evidence whether punitive damages was a proper jury issue. And, in determining the propriety of the trial judge's submission of such issue to the jury, we are not confined to the parameters of Paymaster.
As to punitive damages, we have evolved in this state general guidelines for courts and juries. They are set forth in Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239 at 247 (Miss. 1977).
In that case we added an additional and more specific guideline for a trial court to consider in determining whether the issue of punitive damages under an insurance contract should be submitted to a jury. We stated:
... If an insurance company could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity... . We are of the opinion that the refusal to pay the legitimate claim in this case was an intentional wrong and constituted an independent tort as contemplated in Progressive Casualty Insurance Co. v. Keys, supra.[1]
We then concluded:
Of course, if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie... . [Emphasis added]
354 So.2d 248.
Implicit in this concluding statement is the requirement that the trial judge has the responsibility of making the determination of whether there was an arguably reasonable basis, either legal or factual, for denying the claim. Indeed, only a trial judge could determine whether a legal basis asserted by the insurance company for denying the claim was an "arguable reason," or "reasonably arguable." We have come to term an insurance carrier which refuses to pay a claim when there is no reasonably arguable basis to deny it as acting in "bad faith," and a lawsuit based upon such an arbitrary refusal as a "bad faith" cause of action.
When the presentation of all evidence has been completed by both sides, it is the function and responsibility of the trial court to determine whether the insurance carrier had a reasonably arguable basis, either in fact or in law, to deny the claim. If he finds there was a reasonably arguable basis to deny the claim, then the plaintiff is not entitled to have the jury consider any "bad faith" award against the insurance company.
Any plaintiff asking for punitive damages, or any special or extraordinary damages based upon "bad faith" of an insurance company has a heavy burden.
This is the thrust of our majority holding in Reserve Life, in which we stated:
At the conclusion of the evidence, the trial court at the request of the defendant, should determine whether or not, as a question of law, the insurer had a legitimate or arguable reason to deny payment of the claim... . If the trial court finds that such a legitimate or arguable claim [defense] existed, as shown by the evidence, then the trial court should refuse to grant a punitive damages instruction even though it submits to the jury the question of whether or not the insurer owed the compensatory *843 [contract] claim for which proofs of loss were filed. Legitimate or arguable defenses do not mean that the insurer is entitled to a directed verdict on payment of the claim [contract]... .
444 So.2d 809.

EFFECT OF PRESENCE OR ABSENCE OF DIRECTED VERDICT ON CONTRACT IN A PUNITIVE DAMAGES CLAIM
It can be argued with considerable persuasion that unless the trial judge grants a directed verdict to the insured plaintiff on the contract claim, then, as a matter of law, the insurance carrier has shown reasonably arguable basis to deny the claim; and, therefore, the carrier should never be subjected to the possibility of punitive damages based upon "bad faith."
There is compelling logic behind this argument and this would certainly appear to be true in the vast majority of cases. This criterion should ordinarily determine the answer to the question.
Yet, the test is not infallible. Under some contrived or specious defense, an insurance carrier may be entitled to have the jury pass upon the issue of liability under the contract, yet not thereby insulate itself against a punitive damage claim based upon bad faith. There may be other reasons not yet encountered which will give an insurance carrier a defense on the contract itself, and yet nevertheless the carrier should be subject to a bad faith claim.
Indeed, and this is perhaps the cause of some confusion emanating from Reserve Life: the majority of the Justices in that case were of the opinion that under the special facts therein the plaintiff was entitled to have the jury pass upon the issue of bad faith and punitive damages even though the jury also considered contract liability. Two justices, specially concurring, were of the opinion that the presence or absence of a directed verdict was in and of itself determinative of whether a punitive damages question could be considered by the jury.[2]
It was never the intent of the majority of the Court in Reserve Life to remove from the trial judge the responsibility and function of determining from all the evidence whether or not the plaintiff had created a "bad faith" issue.[3]
This Court, therefore, is not prepared to state as an absolute that there can be no case of a jury considering the question of bad faith even though there was no directed verdict on liability under the insurance contract claim, and the jury also has some factual issue to determine on contract liability. Reserve Life was such a case in the view of the majority of this Court.[4]
Neither are we prepared to state the converse: that in every case in which a plaintiff gets a directed verdict on liability at the conclusion of the case he will automatically be entitled to submit a punitive damages issue based upon "bad faith" to the jury.
The trial judge's and this Court's duty, in determining a reasonably arguable basis to deny the claim, is more encompassing than *844 the single test of whether or not a directed verdict was granted the jury on contract liability.
Regardless of whether the trial court has properly either granted or refused to grant a directed verdict on contract liability, it remains the responsibility and function of the trial court and this Court, in the final analysis, to determine whether or not the insurance carrier, under all the facts of the case, has a reasonably arguable basis, either in fact or in law, to refuse to pay the claim. It is upon this determination by the trial court that the punitive damages based upon bad faith is submitted to the jury.
As we have stated, the plaintiff has a heavy burden to demonstrate to the trial court that there was no reasonably arguable basis for the insurance carrier to deny the claim. Unless he so demonstrates, the trial court as a matter of law is under a duty to remove any punitive damages claim based upon bad faith from consideration by the jury. The defendant insurance carrier is then entitled to a directed verdict on any "bad faith" claim.
As we stated in our original opinion, the circuit judge in this case granted the plaintiff five instructions defining and authorizing a punitive damages award, which the jury denied. These instructions correctly stated the law on punitive damages, but the trial court was in error in granting any punitive damage instruction based upon bad faith because Blue Cross clearly had a reasonably arguable basis for denying the claim.
The trial court also granted, as we have noted, an instruction authorizing "compensatory damages," about which we will make final comment. In Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829 (Miss. 1970), a case in which we approved a punitive damages award, we disapproved a similar instruction to that granted Campbell in this case.
We are not called upon to re-evaluate our holding in Travelers in this case because Blue Cross was not guilty of bad faith. Even if we recognized that a "compensatory damages" instruction might be proper in certain cases, it would have to be predicated upon the trial judge's first determining there was no reasonably arguable basis to deny the claim. In this case, as we have stated, Blue Cross clearly had an arguable reason to deny the claim.
Our sister state Alabama has embarked upon compensatory bad faith damages in a series of cases. Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054 (Ala. 1979); Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala. 1981); Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981); Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala. 1981); National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala. 1982); National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala. 1982); Federated Guaranty Life Insurance Co. v. Wilkins, 435 So.2d 10 (Ala. 1983); Safeco Insurance Co. v. Sims, 435 So.2d 1219 (Ala. 1983); McLaughlin v. Alabama Farm Bureau Mutual Casualty Insurance Co., 437 So.2d 86 (Ala. 1983); Cincinnati Insurance Co. v. Little, 443 So.2d 891 (Ala. 1983); Dickey v. Alabama Farm Bureau Mutual Insurance Co., 447 So.2d 693 (Ala. 1984); Independent Life & Accident Insurance Co. v. Parker, 449 So.2d 233 (Ala. 1984); National Security Fire & Casualty Co. v. Vintson, 454 So.2d 942 (Ala. 1984); Armstrong v. Life Insurance Co. of Virginia, 454 So.2d 1377 (Ala. 1984); Payne v. National Insurance Co., 456 So.2d 34 (Ala. 1984); Marcus v. St. Paul Fire & Marine Insurance Co., 543 F. Supp. 253 (D.C.Ala. 1982); Southeast Nursing Home v. St. Paul Fire & Marine Insurance Co., 559 F. Supp. 883 (D.C.Ala. 1982); Dempsey v. Auto Owners Insurance Co., 717 F.2d 556 (11th Cir.Ct.App. 1983). The Alabama cases require that the court first determine from all the evidence whether or not there was a reasonably arguable basis to deny the claim. If there was such basis, under Alabama law the defendant is entitled to a *845 directed verdict on any claim based upon bad faith.[5]
As above noted, we are not called upon in this case to re-evaluate Travelers and consider the adoption of the same or similar damages concept not recognized in Alabama, and we do not address the question in this case.
We do note that in a proper punitive damages case in this state it has been long recognized the jury may consider in making a punitive damages award, the emotional distress and even attorney's fees of the plaintiff. New Orleans, Jackson and Great Northern Railroad Co. v. Albritton, 38 Miss. 242 (1859); Cowden, Trustee v. Lockridge, 60 Miss. 385 (1882); Yazoo & M.V.R. Co. v. Consumers' Ice & Power Co., 109 Miss. 43, 67 So. 657 (1915); Kalmia Realty & Insurance Co. v. Hopkins, 163 Miss. 556, 141 So. 903 (1932); Cooper v. U.S. Fidelity & Guaranty Co., 186 Miss. 116, 188 So. 6 (1939); City of Laurel v. Bush, 238 Miss. 718, 210 So.2d 149 (1960); Daniels v. Adkins Protective Service, Inc., 247 So.2d 710 (Miss. 1971); Bellefonte Insurance Co. v. Griffin, 358 So.2d 387 (1978); Aetna Casualty & Surety Co. v. Steele, 373 So.2d 797 (Miss. 1979).[6]
This is not the occasion for this Court to precipitately adopt some new concept on damages in the absence of a clear necessity and wisdom therefor.
PETITION FOR REHEARING DENIED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and SULLIVAN, J., concur.
ROBERTSON, DAN M. LEE, PRATHER and ANDERSON, JJ., specially concur.
ROBERTSON, Justice, concurring:

I.
I concur in the denial of the petition for rehearing in this case. As recited in Justice Hawkins' original opinion released December 19, 1984, deciding the case on the merits on direct appeal, there are facts in the record on the basis of which Blue Cross would have been able to withstand Plaintiff Campbell's request for a peremptory instruction on the liability feature of the underlying contract claim, had that claim been litigated. Applying the view of the law I articulated in my concurring opinion in Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 814-819 (Miss. 1983), Plaintiff's evidence does not rise to the dignity of a bad faith claim.
When this case was decided on direct appeal, I dissented. I did so at the time because I regarded that we were bound by the formulation contained in the majority opinion in Reserve Life, 444 So.2d at 809-810. That formulation, as I have understood it, would in the case at bar have precluded (a) the granting of Blue Cross' request for a peremptory instruction in the face of Campbell's bad faith refusal claim, and (b) the granting of Blue Cross' subsequent motion for judgment notwithstanding the verdict. I had great misgivings about the Reserve Life formulation when it was adopted. I am pleased that a majority of the Court now believes we should move away from that view and toward the view I expressed in my concurring opinion in Reserve Life, 444 So.2d at 814-819.
The opinion of Justice Hawkins notes on more than one occasion that there is "confusion emanating from Reserve Life". Majority Opinion, at 843 n. 3. I agree. I do not agree that the majority opinion only "clarif[ies] and reiterate[s] our Reserve Life holding." In my view the majority opinion emasculates Reserve Life and to that extent I applaud it. The majority opinion, nevertheless, contains vices of *846 its own and  though it be a step forward from Reserve Life  stops short of a full and clear articulation of practicable rules regarding the criteria (a) by which trial judges may be expected to decide whether to submit a given bad faith refusal claim to the jury, and (b) by which we should review such trial court decisions when they are presented to us on appeal. I would go farther.
In this separate opinion I will first identify the substantive components of our law of bad faith refusal claims and present my concerns with the pronouncements of law in Reserve Life. Then, borrowing heavily from my concurring opinion in Reserve Life, I will reiterate my view of what the law in these cases ought to be. Finally, I will demonstrate why the majority here, though making an important step forward, has in my view stopped short of the mark.
I have a broader concern. We now have on the books a number of decisions in bad faith refusal cases beginning with Standard Life Insurance Company of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), through Reserve Life and now Blue Cross, both on direct appeal and on denial of rehearing.[1] *847 My fear is that we have created the impression that we decide these cases almost on an ad hoc basis. The trial judge seeking to apply the law faithfully, or just trying to handle a bad faith refusal case so that it won't be reversed, is presented quite a dilemma.
I understand and respect Justice Hawkins' determination, in his opinion denying rehearing in the case at bar, to say as little as possible, to avoid closing the door to arguments and fact situations other cases may present down the line. Still, eight years have elapsed since Standard Life Insurance Company of Indiana v. Veal. At some point it becomes incumbent upon us that we provide the trial judges and the litigants who appear before them sufficient guidance that they may try bad faith refusal cases, according to neutrally stated and generally applied rules of law, excising to the extent practicable passion, prejudice and other arbitrary factors, and without inordinate risk of reversal.

II.
Preliminarily, we must fix in mind just what a bad faith refusal case is. Our decisions beginning with Standard Life Insurance Company of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), have concentrated, first, on the elements of the bad faith refusal claim and, second, on the circumstances in which punitive damages may be recovered. It is much too late to doubt that there are circumstances under which an insured may recover from his insurer sums over and above the actual benefits provided in the policy.
Bad faith refusal claims generally arise in the context of an insurance contract between the parties, although there is no reason on principle why the claim should not be allowed in other analogous contexts. See Southern Farm Bureau Casualty Insurance Co. v. Holland, 469 So.2d 55 (Miss. 1984). Essentially, our cases recognize that to recover more than policy benefits plus interest, the plaintiff must prove:
(a) an intentional refusal by the insurance company to pay with reasonable promptness the insured's claim;
(b) the absence of any arguable reason for the insurance company's refusal to pay with reasonable promptness. Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916, 924 (Ala. 1981); accord Michael v. National Security Fire & Casualty Co., 458 F. Supp. 128, 130-31 (N.D.Miss. 1978).
Once the elements of the bad faith refusal claim are established, it should follow on principle that the plaintiff insured may recover, over and above the contract claim, actual damages foreseeable to the insurer and proximately resulting from the insurer's bad faith conduct.[2] We have no cases expressly authorizing recovery of such non-contract, actual damages, although the proposition is implicitly recognized in Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829, 836 (Miss. 1979) and Bellefonte Insurance Co. v. Griffin, 358 So.2d 387 (Miss. 1978). See Peel v. American Fidelity Assurance Co., 680 F.2d 374, 376 (5th Cir.1982). As Justice Hawkins indicates in his opinion denying rehearing, Alabama allows recovery of such actual damages.
To recover punitive damages, a plaintiff insured must show more, much more, for punitive damages are "assessed against defendant[s] only in extreme cases". Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983). "... [P]unitive damages are not favored in the law and are to be allowed only with caution and within narrow limits." Tideway, 431 So.2d at 460 fn. 1. Employing language unmarked by precision in thought or clarity of expression, we have said that

*848 punitive damages are recoverable where the defendant has done to the plaintiff such a wrong as to import insult, fraud, oppression or reckless disregard for the rights of plaintiff.

Tideway, 431 So.2d at 465; T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 485 (Miss. 1972); Seals v. St. Regis Paper Co., 236 So.2d 388, 392 (Miss. 1970).
Suffice it to say that we have yet to articulate a principled basis for the adjudication of bad-faith-refusal/punitive-damages cases that will adequately minimize the influence of passion and prejudice and other arbitrary factors in the decision-making process.

III.
The matter at issue here, as was the case in Reserve Life, is by reference to what rules and in accordance with what procedures does the trial judge determine whether a bad faith refusal claim, for punitive damages or otherwise, should be submitted to the jury. The majority opinion in Reserve Life formulates a response to this question in one-two-three fashion on pages 809 and 810 of the opinion. 444 So.2d at 809-810. With respect, I regard that formulation as infected three-fold; it is in substantial part confusing, irrelevant and outrightly erroneous. What value it has is so obscured that I believe we should profit were it altogether removed from our law.
Having painted with a broad brush, I should demonstrate where in particular the Reserve Life formulation fails. I begin with Step One which reads as follows:
1. At the conclusion of the evidence, the trial court at the request of the defendant, should determine whether or not, as a question of law, the insurer had a legitimate or arguable reason to deny payment of the claim. Of course, such a reason should be a reasonable one. If the trial court finds that such a legitimate or arguable claim existed, as shown by the evidence, then the trial court should refuse to grant a punitive damages instruction even though it submits to the jury the question of whether or not the insurer owed the compensatory claim for which proofs of loss were filed. Legitimate or arguable defenses do not mean that the insurer is entitled to a directed verdict on payment of the claim. The trial court, of course, has the question as to whether or not as a matter of law the insurer had the right to deny payment of the actual money claimed under the policy.
444 So.2d at 809.
I perceive these problems with Step One:
(a) We are told that the trial judge must determine whether the insurer had an arguable reason to deny the claim, i.e., whether the plaintiff has offered enough so that he is entitled to have a jury pass on his bad faith refusal claim, but we are not told by reference to what standard or rule of law that determination should be made. Because there is a substantial factual component to the question whether the insurer had "an arguable reason", the standard of Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975) must apply. Of course, the "request" of the defendant contemplated in Step One is one and the same as the defendant's request for a peremptory instruction on the bad faith refusal claim.
(b) The third sentence begins: "If the trial court finds that such a legitimate or arguable claim existed, ... ." This language at best is highly misleading. Again, whether the insurer defendant has "a legitimate or arguable claim," (translate: "arguable reason") is sufficiently a question of fact so that the trial judge has no authority to make such a finding except he conforms to Paymaster Oil.
(c) I see Step One as confusingly worded in many respects, most significantly in the label given the second element of the insured's bad faith refusal claim. For reasons stated in my concurring opinion in Reserve Life, I would denominate that element the "absence of an arguable reason". As I said there:
In the first place, "legitimate and arguable" and "reasonable" are surely synonyms, *849 at least in this context. The majority states that, to avoid a jury determination of punitive damages, the insurer must have "had a legitimate or arguable reason to deny payment of the claim". [444 So.2d at 809]. The opinion then states, "Of course, such a reason should be a reasonable one." There is I insist no such thing as a "legitimate reason", which is not by definition a "reasonable reason". The same of "arguable reasons". Clarity demands that we jettison two of these synonyms. I would salvage "arguable".
444 So.2d at 815.
(d) The most fundamental error in Reserve Life Step One is that it fails to encompass what in law and logic ought to be Step One: the determination under the Paymaster Oil standard of whether the plaintiff insured is entitled to a peremptory instruction in his favor on the liability aspect of the underlying contract claim.[3]
Step Two in the Reserve Life majority's formulation of the law reads:
2. In the event the trial court determines that as a matter of law it cannot hold that the insurer had a legitimate and arguable defensive position, but that the evidence constituted disputed facts as to whether or not such situation existed, then the trial court should submit that issue to the jury.
444 So.2d at 809.
(a) The inadequacy again is that we are not told by reference to what standard or rule of law the trial judge should gauge the evidence to determine whether there is dispute on the absence-of-an-arguable-reason element of the bad faith refusal claim sufficient so that either litigant of right is entitled to have that matter decided by the jury. That standard is furnished by Paymaster Oil and progeny.
(b) The words "defensive position" imply that the "arguable reason" proposition is a defense that must be pled and proved by the insurer. The correct view is that absence of any arguable reason for the insurance company's refusal to pay the claim with reasonable promptness is the second element of the plaintiff's bad faith refusal claim and, as such, must be established by plaintiff by a preponderance of the evidence.
(c) A more subtle error in Step Two is the impression it creates that here the Court is indeed describing a second separate decision-making juncture of the process. In my view Step Two is the same as Step One, for it follows as the night the day that, if the plaintiff insured is entitled to a peremptory instruction on his underlying policy claim, he is entitled to have his bad faith refusal claim (though not necessarily his claim for punitive damages) submitted to the jury. Conversely, if plaintiff insured is not entitled to a peremptory instruction on the liability feature of his underlying policy claim, it follows, subject to the "lying" exception to be described below, that the defendant insurer is entitled to a peremptory instruction on the bad faith refusal claim. In short, in the vast majority of cases there will be no Step Two. The Step One inquiry, understood in the manner described above will be the only one that need be made. Whether Plaintiff insured is entitled to have the jury consider his bad faith refusal claim for non-contract actual damages will follow mechanically from a correct determination of the fundamental Step One inquiry: is the plaintiff insured under the Paymaster Oil standard entitled to a peremptory instruction in his favor on the liability feature of the underlying contract claim?
(d) In the context of what has just been said, Step Two correctly understood will be whether the case at bar is one of those rare cases where the matter of a possible assessment of punitive damages should be *850 submitted to the jury. As indicated in Section II above, we have far to go in delineating the standards by reference to which punitive damages should be assessed, i.e., what the trial court should say in its instructions to the jury. Moreover, it is this question more than any other we perceive Justice Hawkins to be excising from the clutches of Paymaster Oil and progeny.
Step Three in the Reserve Life majority's formulation of the law reads:
3. After deciding the threshold question of whether or not it is a jury question on the issue of legitimate or arguable reason to deny or cancel, the trial court then should make a determination as to whether or not the evidence is sufficient to submit a punitive damages instruction to the jury under the guidelines set out in Veal, supra.

444 So.2d at 810.
(a) The problem here lies in Step Three's suggestion that the question of whether the punitive damages issue goes to the jury are "the guidelines set out in Veal, supra." 444 So.2d at 810. Veal states
[I]f an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, ... .
354 So.2d at 248. The guidelines set out in Veal take us right back to the absence-of-an-arguable-reason element of the bad faith refusal claim. Veal states the question the jury must answer if the facts are disputed. It suggests content for instructions to be given the jury. But what quantum or quality of evidence must be before the trial court before it may decide that question should be submitted to the jury is an entirely different question. Veal affords no clue as to the answer. We determine whether an insurance company has an arguable reason for failing to pay a claim with reasonable promptness by asking, as explained above, whether the plaintiff insured, under the Paymaster Oil standard, is entitled to a peremptory instruction on the liability feature of the underlying contract claim. Seen in this light Step Three is also the same as Step One.
(b) There is a core of validity in the distinction drawn in Step Three between (1) the determination whether a jury question is presented on the matter of the insured's claim of the absence of an arguable reason for failure to pay the claim, and (2) the determination whether the punitive damages issue should be submitted to the jury, but before that core may become apparent we must refine the remedial features of our law of bad faith refusal claims beyond what is on the books as of this writing. As indicated in Section II above, I would authorize a plaintiff insured's recovery, over and above the contract claim, of actual or compensatory damages proximately resulting from the insurer's bad faith conduct. Those damages should include economic loss (which ordinarily will consist of attorneys fees and legal expenses) and emotional distress. I would hold that, where the plaintiff insured is entitled to a directed verdict on the liability feature of his underlying policy claim, he is then entitled as a matter of right to present to the trier of fact the question of what actual or compensatory damages he may have suffered as a proximate result of the insured's bad faith refusal to pay the claim. Were we today holding Campbell entitled to withstand Blue Cross' motion for judgment notwithstanding the verdict we would have to face the actual damages issue foursquare, for the jury below in fact awarded Campbell $10,000.00 in actual damages. In view of the disposition we make, final settlement of that issue may await another day.
To return to the point, we trust by now we have demonstrated that the Step One-Two-Three formulation of the majority opinion in Reserve Life should henceforth be disregarded. A mere "clarification" will hardly suffice. Indeed, when Justice Hawkins begins with a recognition that the "criterion [which] should ordinarily determine" whether the bad faith refusal claim should be submitted to the jury is whether "the trial judge grants a directed verdict to the insured plaintiff on the contract claim", p. 843, he dispatches Reserve Life from our law. To pretend that all that is being *851 accomplished is a "clarif[ication] ... and reiterat[ion of] our Reserve Life holding" is disingenuous. A fresh start is required.

IV.
It is my view that this fresh start may be achieved without doing violence to the result in Reserve Life. The formulation discussed above was in no way necessary to the decision in Reserve Life. Indeed, as I explained in my concurring opinion, 444 So.2d at 814-819, the net result of that case, i.e., that the Plaintiff should prevail on his bad faith refusal claim, was the same under my view of what the law should be.
The case at bar, however, is different. If we be faithful to the Step One-Two-Three formulation of the majority opinion in Reserve Life, I still regard that the bad faith claim was properly submitted to the jury. On the other hand, under the formulation I articulated in my special concurring opinion in Reserve Life, the opposite result obtains and Justice Hawkins' view that Blue Cross was entitled to judgment notwithstanding the verdict is seen as correct. Since this is a case where it does make a difference which formulation is adopted, and since it appears that several members of the Court have expressed reservations about the Reserve Life majority's formulation, I will here restate my view of the law, and propose its adoption as "a fresh start".

A.
Generally speaking, if the insurer has at trial denied liability on the policy  asserted lack of coverage, an affirmative defense, or whatever  and if the state of the evidence after all parties have rested is such that under our familiar rules the factual issue may not be taken from the jury, see e.g., Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), then the plaintiff insured is not entitled to a peremptory instruction on the underlying policy claim and as a matter of law the insurance company becomes insulated from a bad faith refusal claim. See Reserve Life, 444 So.2d at 815 (concurring opinion). This general analysis is subject to the "lying" exception discussed below.
If the evidence is such that a reasonable jury could find facts which would undergird a successful policy defense, the same evidence surely would justify a reasonable insurance company in so concluding. Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), holds that:
If an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, ...
354 So.2d at 248.
An arguable reason is one in support of which there is some credible evidence. There may well be evidence to the contrary. A person is said to have an arguable reason for acting if there is some credible evidence that supports the conclusions on the basis of which he acts. And when we say this, we are in essence articulating in an extra-judicial context our familiar rules regarding what proof is necessary to create a jury question. See, e.g., Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
As indicated in Justice Hawkins' opinion, Alabama subscribes to the view we state here. For example, in National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala. 1982), the Supreme Court of Alabama held
In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.

*852 419 So.2d at 1362.
See also Freeland, et fil., Bad Faith Litigation: A Practical Analysis, 53 Miss.L.J. 237, 245-247 (1983).
If there is a jury issue on the underlying policy question, that is, if the plaintiff insured is not entitled to a peremptory instruction on the liability feature of his underlying policy claim, then it follows a fortiori that the insurance company has an arguable reason for failing to pay the claim. This is so whether the underlying policy claim is in fact litigated. Where as here the underlying policy claim has been settled prior to trial, the question for the trial judge is whether under Paymaster Oil plaintiff insured would have been entitled to a peremptory instruction on the underlying policy claim, if it had been litigated.
In this world we live in, the criterion of reasonableness for evaluating jurors is not in fact different from that criterion of reasonableness for evaluating insurance claims adjusters. They are all people. The law ought not to define differences in people that do not correspond to differences in fact.

B.
There is one exception to the general approach articulated in Section IV(A) above which must in fairness be incorporated into our scheme of determining when a bad faith refusal claim should be submitted to a jury. This is what I refer to as the "lying" exception. It arises in the context of an insurance company's defense which is based wholly on an issue of the truthfulness of the insurance company's witnesses. Put more bluntly, where the central issue in the underlying policy claim turns on whether a representative of the insurance company has lied, the approach described in Section IV(A) above will not work. In such cases we must allow submission to the jury of the bad faith refusal claim even though the plaintiff insured is not entitled to a peremptory instruction on the liability feature of his underlying claim.
For reasons we trust are obvious, it is a dubious practice for trial judges to become involved in determinations of who is lying when faced with a motion for a directed verdict, a request for a peremptory instruction or the like. Because of this, we recognize the possibility that an unscrupulous insurance company could well feign a "jury issue" by placing a representative on the witness stand who simply lies. Where such is the nature of the jury issue presented on the underlying contract claim, and where the jury may find for plaintiff only by determining that the insurance company's representative has lied, the trial judge may also submit to the jury the bad faith refusal claim.
A point bears emphasis. This exception to the general rule proposed above (and accepted loosely in Justice Hawkins' opinion) would be operative only where the jury is asked to reject on grounds of deliberate falsehood or fabrication the insurer's defense to the underlying contract claim. The fact that there is present a credibility issue with respect to the litigation of the underlying contract claim is wholly consistent with the insurer's having a viable arguable reason defense where all that is suggested is that the insurer's representative is mistaken in his view of the facts. In this context, we emphasize the desirability of utilization of the special verdict under Rule 49(b), Miss.R.Civ.P. and, where appropriate, the judgment notwithstanding the verdict under Rule 50(b) or, in the alternative, the motion for a new trial under Rule 59, all to the end that justice may be done.

C.
A further word. It would be neat and tidy if we could simply hold that, at the conclusion of all of the evidence in a bad faith case, the trial judge should consider the question of whether a jury question is presented on an underlying policy defense, and that, if he holds that a jury issue has been made out, he should then direct a verdict in favor of the insurance company on the bad faith refusal claim. Such a *853 procedure would have logical symmetry, but little else to recommend it. The real world is seldom neat and tidy.
This Court has repeatedly urged trial judges, faced with a motion for a directed verdict, or a request for a peremptory instruction, in doubtful cases, to go ahead and submit all issues to the jury, reserving the prerogative of "correcting" any jury verdict later on the motion for judgment notwithstanding the verdict. See, e.g., Astleford v. Milner Enterprises, Inc., 233 So.2d 524, 526 (Miss. 1970); Claiborne v. Greer, 354 So.2d 1109, 1111 (Miss. 1978). This, we say, saves needless retrial if on appeal we disagree with the trial judge and hold that a jury issue was made out.
In our trial courts there are many close cases. It requires no great insight  only candor  to note that, even in cases where there is no dispute regarding the controlling substantive rules of law, frequently reasonable minds may differ whether a jury issue has been created. See, e.g., Pharr v. Anderson, 436 So.2d 1357, 1361-1366 (Miss. 1983), not to mention Reserve Life Insurance Company v. McGee, 444 So.2d 803, 812, 815-816, 819 (Miss. 1983). Jury questions, like beauty, are often in the eye of the beholder. There are many cases where the plaintiff is within an inch or two of losing his case via a peremptory instruction, if only our eyesight were good enough to determine with accuracy which side of the line his proof is really on.
Because such matters are gray and are often difficult to determine even with the benefit of the cool reflection on the record we are able to bring to bear, we urge our trial judges to submit such cases to the jury. This should be done in claims on insurance policies. On the underlying claim, it happens not infrequently that the evidence is close as to whether the plaintiff insured is entitled to a peremptory instruction as a matter of law.
In all bad faith refusal cases, where in the opinion of the trial judge there is sufficient evidence to submit to the jury the plaintiff insured's bad faith refusal claim, special verdicts under Rule 49(b), Miss.R. Civ.P., should be used. This should be done even where the trial judge is in doubt whether the plaintiff insured is entitled to a peremptory instruction on his policy claim. The appropriate fact questions on the underlying policy and the insurance company's affirmative defenses should be submitted as separate questions. Then, the appropriate questions on the bad faith refusal claim, extra-contractual action and punitive damages issue should be submitted, if warranted by the proof.
Once the jury's special verdict is received, both the trial court and, in the event of an appeal, this Court, are in a position to render final judgment. Specifically, if on post-verdict motion and upon reflection the trial judge is of the opinion that he properly submitted to the jury the plaintiff's underlying policy claim, that is, that plaintiff was not entitled to a peremptory instruction on that claim, a judgment in favor of plaintiff on the bad faith refusal claim would be precluded as a matter of law. A holding by the trial judge that plaintiff was not entitled to a peremptory instruction is tantamount to a holding that the insurance company had "an arguable reason for failing to pay a claim" within the meaning and contemplation of the now famous dicta from Standard Life Insurance Company of Indiana v. Veal, 354 So.2d at 248.
Where the Rule 49(b) procedure is employed, we are on appeal in a position to dispose of the case finally. Where we find plaintiff was not entitled to a peremptory instruction on the underlying policy claim, reversal of any judgment rendered on plaintiff's bad faith refusal claim inexorably follows.

V.
I regard the opinion authored by Justice Hawkins as an important step forward from Reserve Life. Still, there are several points with respect to which he has not brought to our law the clarity and structure which in my view are demanded. I outline these here.
*854 As is made clear above, there is truth in Justice Hawkins' statement that
In a punitive damages case, it is the responsibility and function of the trial judge, after reviewing all of the evidence, to first determine whether the facts of that particular case justify submitting to the jury the issue of such punitive or special damages.
p. 841-842. Similar statements appear on page 842, 843 and 844.
I have two problems with this statement. First, it blurs the distinction I regard as important between (a) whether the plaintiff's bad faith refusal claim goes to the jury, in which event actual extra-contractual damages proximately caused by the insurer's bad faith conduct must be assessed and (b) whether plaintiff has adduced at trial that additional quantum and quality of proof sufficient to justify submitting to the jury the possible assessment of punitive damages against defendant insurer. Second, I would make clear that, with respect to the plaintiff insured's bad faith refusal/actual extra-contractual damages claim, the trial judge may perform his function only by reference to rules articulated in Paymaster Oil and progeny.
While the question of whether the plaintiff insured has established the absence, on the part of the insurance company, of an arguable reason for refusing to pay a claim certainly involves to some extent the application of a rule of law, this issue most accurately may be described as an issue of ultimate fact or perhaps a mixed question of law and fact. As such, it is subject to the Paymaster Oil rule on two counts: First, when the trial court is faced with the question of whether the bad faith refusal claim should be submitted to the jury and, second, when we review the sufficiency of the evidence on appeal.
In my view our polestar is Article 3, Section 31, Mississippi Constitution of 1890, and its guarantee to each citizen of the right to trial by jury in civil cases. All pure questions of fact and all questions having substantial factual components triable by a jury at common law may of right be subject to jury determination in civil actions in this state. City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983). The raison d'etre of Paymaster Oil and progeny is to assure that the constitutional right to trial by jury remains secure.
The question under focus here is the absence-of-an-arguable-reason component of the bad faith refusal claim spawned in Veal, 354 So.2d at 248. It seems clear that whether an insurance company has an arguable reason for refusing to pay a claim is largely a question of fact.[4] Such a question involves an inquiry which by and large will be of no concern or interest outside the context of the particular action in litigation. It is a "what happened here" type of inquiry. Such inquiries by definition are ones of fact.
It is no answer to say that some knowledge of insurance law and practice must be brought to bear in determining whether an insurance company has a valid arguable reason defense. Such does not convert the inquiry into one of law that may be excised from Section 31 of our Constitution and the Paymaster Oil rule it has generated, any more than technical questions in the fields of medicine, physics, engineering, statistics and the like cease to be Section 31/Paymaster Oil questions of fact.
As I read page 842 of Justice Hawkins' opinion, he dispatches Paymaster Oil as the trial judge's guide for determining whether a jury question is present and apparently replaces Paymaster Oil with Standard Life v. Veal. Justice Hawkins writes that in Veal
we added an additional and more specific guideline for a trial court to consider in determining whether the issue of punitive damages under an insurance contract should be submitted to a jury.

p. 842.
*855 With respect, I cannot find such guidelines in Veal. In general terms Veal states the substantive question the trier of fact must answer. To my mind, however, Veal gives no clues whether, when the trier of fact is a jury, that substantive question should be submitted to the jury. I, of course, turn to Paymaster Oil and progeny for such clues.
On page 842, Justice Hawkins reiterates his view that only a trial judge may determine whether an insurer has an arguable reason for its refusal with reasonable promptness to pay a claim. I see no difference between this and saying that only a trial judge can determine whether a particular course of conduct constitutes negligence. Both arguable reason and negligence inquiries involve questions of ultimate fact. Put better, they involve mixed questions of law and fact. These questions are determined at the law application stage of the three step process of adjudication.[5] Under our constitution neither may be taken from the jury except the material facts be undisputed under the principles enunciated in Paymaster Oil and progeny.
I disagree with Justice Hawkins' statement on page 843 of his opinion to the effect that Reserve Life was one of those rare cases where a plaintiff insured's contract claim was submitted to the jury and where in addition his bad-faith-refusal/punitive-damages claim was also properly so submitted. For the reasons set forth in my concurring opinion in Reserve Life, the evidence there was such that under Paymaster Oil, Plaintiff McGee should have been granted a peremptory instruction on the liability feature of his underlying contract claim. Only because that was so did Plaintiff McGee reach the stage where he became entitled to have his bad faith refusal claim presented to the jury. In fact, when the loose standard announced by Justice Hawkins at the top of page 843 of his opinion is applied to the facts of Reserve Life, it is readily seen that Reserve Life is not one of those cases where the insured plaintiff was entitled to have his bad faith claim submitted to the jury notwithstanding that the insured properly avoided a peremptory instruction on the liability feature of the underlying contract claim.
I agree with Justice Hawkins that we should not state "as an absolute" that there can never be a jury question on the bad faith refusal claim unless Plaintiff is also entitled to a peremptory instruction on the liability feature of the underlying policy claim. I also agree with Justice Hawkins' "converse": that not every plaintiff who gets a peremptory instruction on his underlying contract claim is entitled to punitive damages. My concern is with the gray areas left by each such statement.
To be specific, I see no exception to the general rule regarding the effect of the insurer's avoidance of a peremptory instruction on the underlying policy claim except the "lying" exception I have discussed in Section IV(B) above. On the other hand, I would provide expressly that, in addition to everything else, Plaintiff must show more to be entitled to have the jury consider the question of whether punitive damages should be assessed. That more would consist of a showing that the insurer's conduct had reached a heightened level of outrageousness well over and above mere bad faith refusal to pay with reasonable promptness a legitimate policy claim.[6]
*856 Finally, I disagree with Justice Hawkins' statement on page 844 that "Blue Cross clearly had a reasonably arguable basis for denying the claim". This is simply not so, as the testimony at trial of Dr. J.B. Yeldell reflects. A more correct statement  one upon which I predicate my vote to deny the petition for rehearing (now that I understand that we are rejecting the formulation of law found in the majority opinion in Reserve Life in favor of one substantially similar to what I stated in my Reserve Life concurrence)  is: because there was evidence in the record sufficient under Paymaster Oil to prevent Plaintiff Campbell from obtaining a peremptory instruction in his favor on the liability features of the underlying contract claim (had that claim been litigated and not settled), Plaintiff Campbell was not entitled to have his bad faith refusal claim submitted to the jury. It is for this reason that I join now in holding that the trial judge erred in his refusal to grant Blue Cross' motion for judgment notwithstanding the verdict.
In spite of the above criticisms, I want to reiterate what I have said above. I regard Justice Hawkins' opinion as a substantial step out of the murky bog of the Step One-Two-Three formulations of Reserve Life. We simply need to go farther.
PRATHER and ANDERSON, JJ., join in this opinion.
DAN M. LEE, J., joins in result only.
NOTES
[1] Upon Campbell's Discharge Sheet are the following notations:

PROVISIONAL DIAGNOSIS:
Acute alcoholic pancreatitis
FINAL DIAGNOSIS:
Acute pancreatitis
SECONDARY DIAGNOSIS OR COMPLICATIONS:
Pneumonia
Campbell developed pneumonia during his hospitalization, treated successfully with penicillin.
[2] It is incredible that Blue Cross, knowing this claim had been assigned to Delta Medical, would issue a check for the full amount payable only to Campbell and King. See: International Harvester Co. v. Peoples Bank and Trust Co., 402 So.2d 856 (Miss. 1981), a valid assignment conveys entire interest of assignor, leaving him no further interest therein. Also see: Schoolfield v. Hirsch, 71 Miss. 55, 14 So. 528 (1893). 6A C.J.S. Assignments § 81, pp. 728-29; and 6 Am.Jur.2d Assignments § 114, p. 196.
[3] Campbell testified he paid "other bills" with the remainder.
[4] See: Footnote 2, p. 837.
[5] Nor is it necessarily true, that because an insurance company pays a claim prior to being sued, it admits it owed it, and was therefore unjustified in not paying the claim to begin with. In this case it meant that Blue Cross gave Campbell the benefit of a doubt, a rather large benefit of a doubt.

If we ever announce, as a rule of law, that in paying a claim which has been questioned the insurance company admits to some questionable conduct in handling the claim, then we will guarantee no insurance claim will ever be given the benefit of a doubt. If the company pays prior to litigation, it may subject itself to a bad faith claim. Who wants this?
[1] Progressive Casualty Co. v. Keys, 317 So.2d 396 (Miss. 1975).
[2] Two other Justices dissented, being of the opinion Reserve Life had an arguable reason to deny the claims as a matter of law. There was no difference between the majority and the dissenters on the proposition of law as to when a jury will be permitted to consider punitive damages; their widely divergent view was the application of this principle.
[3] We concede there was language in our majority opinion which might be confusing, but none of the language should be construed to indicate a contrary result than that reached here. We now seek to clarify and reiterate our Reserve Life holding.
[4] In one of these special circumstance cases where the trial court determines that even though there is a factual issue on liability under the policy, a punitive damages instruction based upon bad faith is also proper, the trial court might consider, as Justice Robertson in his special concurring opinion in Reserve Life, 444 So.2d 803, p. 818 (Miss. 1983), suggested submitting under Rule 49(b) M.R.C.P. the issue of liability to the jury first, and if the jury finds for the plaintiff, then submitting the issue of punitive damages based upon bad faith.
[5] Plaintiff and defense lawyers might be interested to learn that in all the decisions of the Alabama Supreme Court following its inauguration of a "compensatory damages" concept, there has not been a single case in which compensatory damages or punitive damages was approved on appeal.
[6] For a review of how the question of attorney's fees in punitive damages cases is handled in other jurisdictions see Brewer v. Home-Stake Production Co., 200 Kan. 96, 434 P.2d 828, 829, 30 A.L.R.3rd 1435 (1967).
[1] See, e.g., Southern Farm Bureau Ins. Co. v. Holland, 469 So.2d 55, 56 (Miss. 1984) (punitive damages may be had in worker's compensation action when insurer's conduct intentional); Griffin v. Ware, 457 So.2d 936, 940 (Miss. 1984) (adjusters owe no duty of good faith and fair dealing); Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 807-12 (Miss. 1983) (no punitive damages when genuine dispute over false statement in application); Taylor v. U.S.F. & G. Co., 420 So.2d 564, 565-66 (Miss. 1982) (no punitive damages in worker's compensation action when insurer's conduct negligent); Consolidated American Life v. Toche, 410 So.2d 1303, 1306 (Miss. 1982) (no punitive damages as a matter of law when insurance company denied claim because of clerical error); Aitken v. State Farm Mutual Auto. Ins. Co., 404 So.2d 1040, 1045 (Miss. 1981) (no punitive damages as a matter of law when insurance company prevailed on the main claim); Gulf Guar. Life v. Kelley, 389 So.2d 920, 923 (Miss. 1980) (no punitive damages as a matter of law when insurance company litigated a case of first impression); State Farm Mut. Auto. Ins. Co. v. Roberts, 379 So.2d 321, 322 (Miss. 1980) (no punitive damages as a matter of law when insurance company litigated a dispute over amount of insurance claim); Aetna Casualty & Sur. Co. v. Steele, 373 So.2d 797, 801-02 (Miss. 1979) (no punitive damages as a matter of law when question of coverage was present); Travelers Indem. Co. v. Wetherbee, 368 So.2d 829, 835 (Miss. 1979) (punitive damage instruction appropriate when insurance company uses plaintiff's financial distress for settlement leverage); Bellefonte Ins. Co. v. Griffin, 358 So.2d 387, 391 (Miss. 1978) (no punitive damages as a matter of law when denial of the claim resulted from company negligence); New Hampshire Life Ins. Co. v. Smith, 357 So.2d 119, 121 (Miss. 1978) (no punitive damages as a matter of law when policy gave the insurance company a right to a medical report and the report was not forthcoming); Standard Life Ins. Co. v. Veal, 354 So.2d 239, 248 (Miss. 1977) (punitive damage instruction appropriate when basis for denial of the claim was contrary to express terms of the policy); Lincoln Nat'l. Life Ins. Co. v. Crews, 341 So.2d 1321, 1322 (Miss. 1977) (punitive damages instruction not justified because insurance company merely defended and lost); Progressive Casualty Ins. Co. v. Keys, 317 So.2d 396, 397-98 (Miss. 1975) (no punitive damages as a matter of law when insurance company litigated a dispute over the amount of the main claim).

There are Federal cases involving Mississippi bad faith and insurance law. See, e.g., Merchants Nat. Bank v. Southeastern Fire Ins. Co., 751 F.2d 771, 775-76 (5th Cir.1985) (punitive damages instruction proper for gross negligence in claim investigation); Henderson v. U.S.F. & G. Co., 695 F.2d 109, 113-14 (5th Cir.1983) (Henderson II) (although advice of counsel would serve as a defense, it was not proved); Richards v. Allstate Ins. Co., 693 F.2d 502, 504-05 (5th Cir.1982) (punitive damages appropriate when company denies claim under a policy provision contrary to state law); Peel v. American Fidelity Assurance Co., 680 F.2d 374, 376 (5th Cir.1982) (no punitive damages as a matter of law when insurance company litigated factual dispute over medical testimony); Henderson v. U.S.F. & G. Co., 620 F.2d 530, 636-37 (5th Cir.) (Henderson I) (punitive damages appropriate when insurance company intentionally hid existence of coverage), cert. denied, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); Black v. Fidelity & Guar. Ins. Underwriters, Inc., 582 F.2d 984, 990-91 (5th Cir.1978) (reversed and remanded trial court decision for failure to determine whether arguable basis or excuse was present); O'Malley v. U.S.F. & G. Co., 602 F. Supp. 56, 59 (S.D.Miss. 1985) (no punitive damages allowed if plaintiffs fail on actual damages claim); State Farm Mut. Ins. Co. v. Universal Underwriters Ins. Co., 601 F. Supp. 286, 291 (S.D.Miss. 1984) (trial result in other lawsuit provided arguable excuse, so no punitive damages); Patton v. Aetna Ins. Co., 595 F. Supp. 533, 536 (N.D.Miss. 1984) (no punitive damages when genuine dispute whether coverage had commenced); O'Connor v. Equitable Life Assurance Society, 592 F. Supp. 595, 597-99 (N.D.Miss. 1984) (no punitive damages when genuine dispute concerning disability); Horton v. Hartford Life Ins. Co., 570 F. Supp. 1120, 1122-24 (N.D.Miss. 1983) (same); Michael v. National Sec. Fire & Casualty Co., 458 F. Supp. 128, 131-32 (N.D.Miss. 1978) (no punitive damages as a matter of law when insurance company litigated a case of first impression).
[2] Subsequently, in this opinion I use the phrase "bad faith conduct". That phrase contemplates conduct by an insurance company which fully meets the above two element test.
[3] This should be Step One without regard to whether the underlying policy claim is actually litigated. Here, that claim was settled well prior to trial. Under Step One the trial judge must determine, on the basis of the proof before him viewed under the Paymaster Oil standard, whether plaintiff would have been entitled to a peremptory instruction on the liability feature of the underlying contract claim, if it had been litigated.
[4] See generally Hart & Sacks, The Legal Process: Basic Problems In The Making And Application Of Law (Temp.Ed. 1958) 373-380.
[5] The three steps are: (1) identification of the relevant facts and resolution of all issues of evidentiary fact; (2) declaration of the applicable rules of law, and (3) application of the law to the facts to produce a result. See Hart & Sacks, supra note 4, at 374-375.
[6] As I have indicated above, I regard as wholly unsatisfactory the present state of our substantive and procedural law regarding the submission to the jury of punitive damages questions in bad faith refusal cases. A review of our cases coupled with a peek out the window to see what is happening in the trial courts disturbs me. Substantively, we have furnished vague general criteria out of which our trial judges must fashion jury instructions upon receipt of which our juries no doubt feel they have been given little, if any, guidance. Procedurally, indeed constitutionally by virtue of Section 31, we have yet to give the trial judges a hint as to the criteria they ought to employ in deciding whether in a given case the quantum and quality of evidence is such that the question of the possible assessment of punitive damages should be submitted to a jury. Because in the case at bar the jury found against Campbell on the punitive damages issue and because the matter has not been appropriately briefed, our answering these questions should await another day.