Patricia Stephenson
**EICHENSEER, Plaintiff,**

v.

**RESERVE LIFE INSURANCE COMPANY, Defendant.**

**No. EC85–415–LS–D.**

United States District Court,
N.D. Mississippi, E.D.

March 18, 1988.

Thomas L. Kesler, Sams & Kesler, De-Witt T. Hicks, Jr., Gholson, Hicks & Nichols, Columbus, Miss., for plaintiff.

L.F. Sams, Jr., John S. Hill, Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, Miss., for defendant.

## OPINION

SENTER, Chief Judge.

In this diversity action, plaintiff alleges that the defendant insurer acted with reckless disregard for her contractual rights and was grossly negligent by denying her claim for health insurance benefits. Plaintiff seeks an award of both extracontractual compensatory damages and punitive damages as a result of the defendant's actions.

A nonjury trial has been conducted, and the court now issues the following findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.P.

### Findings of Fact

a) The Parties

Patricia Stephenson Eichenseer, plaintiff herein, was born on February 4, 1945, the daughter of Mr. and Mrs. Woodie Taylor. She has resided in Mississippi all her life with the exception of a brief stay in Michigan. She presently lives with her father in the community of Westville, located in Monroe County.

The Reserve Life Insurance Company is a Texas corporation with its principal place of business in Dallas. The company is qualified to do business in Mississippi and has issued insurance policies to people in this state for many years.

b) General Background

Plaintiff is five feet six inches tall and weighs 175 pounds. Her educational background is unknown but presumably includes attendance through at least the high school level. She has previously worked at the local hospital and at a pants factory in Greenwood Springs.

Plaintiff's health was excellent until 1982 when her mother passed away. As a result of the stress and anxiety accompanying this loss, plaintiff began to suffer from a multitude of ailments, including colds, high blood pressure, nervousness, depression, esophagitis, stomach and abdominal pain, and gastritis. Plaintiff visited her treating physician, Dr. L.R. Murphree, a total of eleven times during the year and was admitted to the local hospital for treatment of abdominal pain in December, 1982. Medications prescribed for her health problems included alderil, clavil, lasix, othoxicol, decatron, reglan, darvon, talwin, benedril, and mylanta. The abdominal pain which caused the plaintiff to be hospitalized was cured by administering an enema.

The Taylors first purchased health insurance from Reserve Life in 1949. One of the insureds named in the policy was Patricia, then five years old. Over the next thirty-five years, Patricia made one or two minor claims under this policy, and all were apparently paid without dispute.

Sue Wilson, an agent for Reserve Life since 1979, sold the Taylor family a medicare supplement policy in mid-1982. In late 1982, Wilson contacted the plaintiff about purchasing her own health insurance. Plaintiff declined Wilson's offer at that time due to financial difficulties, but agreed to contact her in the near future when her financial outlook improved.

Plaintiff met with Sue Wilson again on January 5, 1983, and agreed to take out a major medical policy. While plaintiff orally responded to the application questions, Wilson wrote the answers as given. Plaintiff stated, *inter alia*, that Dr. L.R. Murphree was her treating physician, that she had not seen him in recent months, and that she was not on any medications at that time. The application also contained a medical

release, executed by plaintiff, which authorized Reserve Life to contact Dr. Murphree or any other doctor to verify the condition of her health. Wilson called Dr. Murphree to see if the plaintiff had regular pelvic examinations and was told that "everything [was] fine." After making this notation on the application, Wilson collected the appropriate premium payment and informed the plaintiff that she was insured.

On January 23, 1983, eighteen (18) days after the effective date of the policy, plaintiff experienced severe pain in her lower abdomen. During a visit to Dr. Murphree the next day, the physician recommended hospitalization. On the hospital admission sheet, Dr. Murphree noted:

*Ch[i]ef Complaint:* Pain [in] the lower abdomen.

present illness: The pain has been present in the lower abdomen in period *for the last 2–3 years.* This attack started about three days ago and has become progressively worse. She has occasional headaches. The head is hurting now, some sore throat. Occasional cough which she contributes to smoking. Appetite is terrific. Bowels have not been moving well the last few days. Nicturia 2–3 times at night. (Emphasis added.)

Over the next few days, plaintiff was given antibiotics through intravenous injection. Her temperature never exceeded 100 degrees, but remained above normal (98.6°). Lab tests revealed an elevated white blood cell count of 18,000, which later declined to 9,343 with treatment.

Dr. Murphree treated the plaintiff for sixteen days before deciding to operate. In addition to prescribing antibiotics, lab reports indicate that a sonogram was performed on January 31, 1983, revealing the possible presence of an adnexal cyst, endometriosis, or pelvic inflammatory disease. A total hysterectomy was performed by Dr. Murphree on February 9, 1983. In his post-operative report, the doctor noted the presence of a) chocolate cystic ovaries, b) markedly thickened and enlarged fallopian tubes, c) pelvic adhesions, and d) displaced ovaries. A pathologist's report later confirmed that the plaintiff had also suffered from endometriosis and cervicitis.

Plaintiff's recovery was largely uneventful, and she was discharged from the hospital on February 19, 1983. In his discharge summary, Dr. Murphree reaffirmed his initial diagnosis of acute PID, but noted the presence of peritonitis, chocolate cysts, tubo-ovarian abscesses, chronic cervicitis, and massive adhesions, indicating the presence of endometriosis.[1]

Plaintiff received $6,658.35 in medical bills during the following weeks and submitted them to Reserve Life in late February for payment. Coverage under her parent's policy was never disputed, and partial payments were made by April of 1983. A majority of the bills fell under the new policy, however, and the decision of Reserve Life to deny payments under this policy gives rise to the instant dispute.

On February 28, 1983, the "Major Medical Unit" of Reserve Life's claims department received plaintiff's hospital bill. A work sheet was set up on March 2, 1983, and the file was sent to another department six days later to be examined. Plaintiff signed a "proof of claim" form and submitted it to Reserve Life on March 23, 1983. On April 21, 1983, she received payment under the old policy, but noted the absence of payment under her new policy.

c) Denial of the Claim and Commencement of Litigation

Reserve Life formally denied plaintiff's claim under her major medical policy on June 2, 1983. This decision was communicated to the plaintiff by form letter and its exact contents are unknown since both she and the insurer failed to retain a copy of

---

**1.** Acute pelvic inflammatory disease (PID) is an infectious condition which causes a woman's reproductive organs to become swollen and painful. The onset of the disease is, by definition, sudden. If not treated immediately, the infection can spread to other parts of the body, resulting in severe complications which may threaten the life of the patient.

Endometriosis is a malignant condition evidenced by bleeding and inflammation of a woman's uterus (or endometrien). Unlike PID, it is not an infectious disease and may be present for some time without the patient being aware of it.

the correspondence. It is undisputed, however, that the letter listed as the reason for the denial the fact that the plaintiff had a pre-existing illness which was not covered by the terms of the policy.

Plaintiff called Reserve Life on June 21, 1983, and requested an explanation for the denial. Al Vick, a Reserve Life employee, told the plaintiff that her file was still with the claims department, but that he would call her back once he had been able to find her file.

Unbeknownst to the public, Reserve Life was by mid–1983 experiencing severe organizational problems. Due to the unexpected success of a recently offered insurance policy, numerous claims were being received by Reserve Life in addition to the normal number of claims. The employees, faced with the task of matching claim correspondence with policyholders' files, often lost documents or were unable to find and file them for weeks at a time. Although the company has since computerized its operations, claims submitted in 1983 were often processed manually and mishandled.

Dena Marie Brannon was the Reserve Life employee responsible for handling plaintiff's claim. Prior to denying her claim, Brannon had obtained only Dr. Murphree's admission summary and had relied solely on the following statement to support a denial: "The pain has been present in the lower abdomen in periods for the last 2–3 years. This attack started about three days ago...." Although the documents then held also listed as an admitting diagnosis "Acute PID," Brannon interpreted the reports to indicate that the plaintiff had been suffering from her illness since 1980–81. Importantly, Brannon did not consult with either the plaintiff or Dr. Murphree before making this decision and chose not to consult with an in-house physician retained by Reserve Life on a part-time basis.

Although the plaintiff made repeated telephone calls to Reserve Life during the following weeks, she received no relief.

On August 22, 1983, after receiving one such call, Reserve Life employees wrote a letter to Dr. Murphree requesting plaintiff's medical records from his clinic. These records were sent to the insurer in a timely fashion, but were apparently misplaced due to the ongoing organizational crisis.

Plaintiff called Reserve Life again on September 20, 1983, to inquire about the status of her claim. The employee who talked to the plaintiff was unable to find either the file or her clinical records, but when asked if the records had been received, responded by stating that the file was still with the claims department. An exhaustive "stop search" was conducted for the records, but once again ended in failure.

Plaintiff again called Reserve Life on October 24, 1983, and asked Al Vick about her claim. Vick, unable to find the clinical records, told the plaintiff that they had been lost. Plaintiff volunteered to send additional copies to him immediately, and Vick said that would be okay. A package containing these records was sent by registered mail to the insurer by the end of the day.

Al Vick apparently failed to inform Dena Brannon of his conversation with the plaintiff. On October 25, 1983, Brannon wrote the plaintiff a second letter denying her claim on the ground of pre-existing illness. This denial was made despite the absence of the clinical records, and neither the plaintiff nor medical authorities had been consulted in the interim. Plaintiff's plea for officials to check with her out-of-state physician was likewise rejected.[2]

Dr. Murphree's clinical records were received by Reserve Life on October 26, 1983. According to Jerry Jenkins, Dena Brannon's supervisor, no one saw the records except Brannon. Receipt of the records was not acknowledged, and Brannon failed to communicate with the plaintiff for the

---

**2.** Plaintiff lived in Michigan for a brief period during 1980–82. In an attempt to show an absence of a "pre-existing illness over the past 2–3 years," plaintiff gave Al Vick the name of her doctor in Michigan on June 21, 1983, and told him to feel free to verify her statements. Apparently, this too fell on deaf ears. Neither Vick nor Dena Brennon made any effort to contact the Michigan physician.

next five weeks. When asked to explain this performance, Jenkins explained that it was due to mismanagement.

By late 1983, hospital officials had been unsuccessful in their attempts to collect for plaintiff's hospital stay. Plaintiff's bill was turned over to a local collection agency. She began to receive telephone calls from the agency's employees at work and at home late at night. Already financially troubled, the calls at work forced plaintiff to lower her production level and incur the wrath of her supervisors for receiving personal calls on company time. Plaintiff informed Reserve Life of her troubles during her periodic telephone calls; interestingly, no mention of this can be found in the telephone memos contained in her claims file.

On December 13, 1983, Dena Brannon wrote the plaintiff acknowledging receipt of Dr. Murphree's clinical records. Brannon stated that Reserve Life could not consider payment of plaintiff's claim unless and until Dr. Murphree altered the hospital record to clear up the confusion over the "2–3 years" remark. Brannon further requested that the plaintiff send certified copies of the amended record to Reserve Life in order to allow a medical consultant to review her case.

Plaintiff's response to this letter was twofold. First, she asked Dr. Murphree to comply with Reserve Life's new request. Second, she informed her father of her continuing troubles, and he decided to hire an attorney to represent her.

Dr. Murphree initially declined to alter the hospital records as requested. Convinced that such a change was not ethically permissible, he instead agreed to sign an affidavit recanting the "2–3 years" remark. An affidavit to this effect was not executed, however, until July of 1984, many months later.

Plaintiff's counsel wrote a demand letter to Reserve Life on April 25, 1984, seeking either payment of the claim or an extended explanation for its denial. Counsel also offered to send any additional documents which Reserve Life desired to obtain. Reserve Life wrote to counsel on June 21, 1984, and reaffirmed its denial, attaching in support the admissions summary and clinical records previously received. In a follow-up letter dated July 10, 1984, the company repeated its request for certified copies of the hospital record to enable a medical consultant to review the record.

On July 23, 1984, plaintiff's counsel mailed to Reserve Life a notarized affidavit of Dr. Murphree which asserted that the hospital record was in error and that the statement lower abdomen pain was present for "2–3 years" should read "for 2–3 days." Reserve Life received the letter and affidavit, but lost both documents over the next few weeks.[3]

Plaintiff personally delivered a copy of Dr. Murphree's affidavit to an employee of the Monroe County Hospital and asked that it be placed in the official hospital files. The employee did not refuse plaintiff's request, but it was never placed in the records of the hospital.

In October of 1984, plaintiff was again forced to enter the local hospital for treatment of an unrelated illness. Due to her prior financial troubles and the defendant's refusal to pay plaintiff's prior claims, she was forced to sign papers seeking charitable assistance to pay her bills. Plaintiff's anxiety over the mishandling of her claim increased accordingly.

On October 16, 1984, plaintiff's counsel sent another demand letter to Reserve Life. Six weeks later, a telegram dated November 29, 1984, was received from Dena Brannon in response, stating that she was "having difficulty in assembling the file" and that plaintiff's "patience in this matter is greatly appreciated."[4]

Reserve Life mailed the plaintiff a follow-up letter January 4, 1985. The insurer reaffirmed its denial of her claim and based

---

**3.** Despite Reserve Life's protestations to the contrary, the management of the claims department leads the court to conclude that the letter and the affidavit mailed by plaintiff's counsel were in fact received and then lost.

**4.** Defendant's difficulty in "assembling the file" had, at this point in time, continued over one and one-half years.

its decision on the failure of Dr. Murphree to correct the hospital records.

Plaintiff filed the present complaint on October 4, 1985. An answer was filed by the defendant denying plaintiff's entitlement to relief. By order of the court, discovery was set to run through and including November 30, 1986.

During the course of discovery, defense counsel learned the following: (1) although plaintiff's counsel had mailed a copy of Dr. Murphree's affidavit to Reserve Life, it did not appear in the file and had not previously been considered; (2) Reserve Life's file did not contain all of the hospital records pertaining to plaintiff's stay; the omitted records were also not considered prior to denying her claim; and (3) no physician had been consulted at any time prior to denying plaintiff's claim on June 2, 1983, October 25, 1983, December 13, 1983, June 21, 1984, or January 4, 1985.

Reserve Life paid plaintiff's claim for proceeds on June 16, 1986, after reviewing Dr. Murphree's affidavit. The actual amounts paid were $6,090.35 to the collection agency and $921.00 to the plaintiff. The sums paid do not include interest.

Reserve Life has since expressed regret of its decision to pay plaintiff's claim. After deposing Dr. Murphree and consulting a medical expert, the insurer contends that plaintiff had been suffering from endometriosis for over two to three years and did not suffer from acute PID.

Plaintiff, faced with the above circumstances, decided to bring her suit to trial seeking extracontractual compensatory damages and punitive damages. Since the contract claim has already been paid, the only question facing the court is whether or not she is entitled to prevail on her remaining claims.

d) Presentation of Evidence at Trial

As in many bad faith cases, the amount of time consumed by trial was relatively minimal. Plaintiff's evidence in her case in chief consisted of medical records, expert medical testimony from two doctors, and testimony of the plaintiff herself. The insurance company responded in its case by introducing testimony from two company employees and one medical expert. The plaintiff declined to put on any evidence in rebuttal, and the matter was taken under advisement after all post-trial motions were denied.

The court has already considered the lay testimony given in this case in making findings as to Reserve Life's claims procedures and plaintiff's concurrent responses thereto. With a few exceptions, most of the testimony in these areas was uncontested, and the court refers to the testimony of the plaintiff, Sue Wilson, and Jerry Jenkins elsewhere as appropriate. A summary of the expert medical testimony is instructive, however, and a summary of the evidence will precede the court's findings in this instance.

Two medical experts testified in plaintiff's behalf at trial. Dr. Murphree, plaintiff's treating physician, stated that he felt that the plaintiff had suffered from both acute PID and endometriosis, but surgery was necessitated by PID. Dr. Murphree based his opinion upon the visual examination performed during surgery. Dr. Perrin Smith, a licensed obstetrician/gynecologist (ob/gyn), agreed with Dr. Murphree's diagnosis, noting that symptoms caused by endometriosis would not have been present for the long length of time (almost three weeks) that plaintiff suffered. According to Dr. Smith, none of the medical records enable a physician to conclude (1) that plaintiff's attack of acute PID predated January 5, 1983, or (2) that endometriosis, if present, caused the plaintiff to undergo surgery. Dr. Smith further stated that his conclusions were based upon, and compatible with, all the hospital records including the pathologist's report.

On cross-examination, the defendant attempted to get Dr. Smith to admit that PID existed as both an acute and a chronic disease and that plaintiff's symptoms might be the result of a long-time attack of PID. Dr. Smith rejected this contention, questioning whether PID could, by definition, ever be extended or chronic in nature.

Dr. John R. Sanders, also a licensed ob/gyn, testified in behalf of Reserve Life, but admitted that he had not reviewed plaintiff's medical records until February,

1987, after suit was commenced. Dr. Sanders stated that, in his opinion, the plaintiff had suffered from endometriosis and a bilateral infection caused by chronic PID with acute complications. Dr. Sanders asserted that endometriosis is commonly misdiagnosed as PID, but this may be verified by referring to the timing of the pain. If the female suffers pain prior to her menstrual period and her appetite remains good, then endometriosis is suggested. Moreover, if a patient's fallopian tubes are enlarged, but not infected, then PID is probably not present. Dr. Sanders concluded by agreeing with Dr. Murphree and Dr. Smith in three essential respects: (1) a final medical diagnosis should not be made until after the pathology lab had reported its results, (2) if the plaintiff suffered from acute PID, then her period of disability commenced no earlier than seventy-two hours prior to entering the hospital, and (3) a woman can suffer from both endometriosis and acute PID at the same time.

Based on the foregoing, the court finds that Reserve Life did not have an arguable reason to deny plaintiff's claim until it received the hospital pathologist's report and consulted a medical expert for the proper interpretation. This occurred, by admission of Dr. Sanders, in early 1987. The court further finds that the evidence in this case makes it a likely conclusion that while the plaintiff suffered from both endometriosis and acute PID, her surgery was necessitated solely by symptoms related to the latter.

### Conclusions of Law

By virtue of the citizenship of the parties and an amount in controversy exceeding ten thousand dollars, this court is vested with subject matter jurisdiction. 28 U.S.C. § 1332. Since the plaintiff resides in the Northern District of Mississippi and the claim arose in this district as well, venue lies in this court pursuant to 28 U.S.C. § 1391.

This court is *Erie* -bound to apply the law of Mississippi to resolve all questions of substantive law. *See Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Jackson v. Johns–Manville,* 781 F.2d 394 (5th Cir.1986), *cert. denied,* —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). Since the "center of gravity" lies in this state with respect to all relevant issues, no choice of law questions are presented. *Boardman v. United Services Auto. Ass'n.,* 470 So.2d 1024, 1031 (Miss.1985).

### A. The Development of Bad Faith Law in Mississippi [5]

Mississippi courts have faced the task of resolving insurance disputes for over one hundred forty years. *See, e.g., Natchez Insurance Co. v. Buckner,* 3 Miss. 23 (1839). Nevertheless, the law of bad faith is fairly recent in origin. Delay in the development of this field is perhaps attributable to two factors.

The first factor is derived from the general nature of contract law. Traditionally, a party was "free to break his contract if he chooses" and pay liquidated damages. This principle would be contravened if he were also subject to extracontractual and punitive damages. O.W. Holmes, *The Common Law,* 301 (1881).

The second factor is based on the general nature of common law pleading. At common law, an individual who suffered an injury from one sequence of events was said to have one "cause of action." Although he could sue under either a tort theory or a contract theory, both claims could not be joined in the same suit, and *res judicata* prevented recovery a second time if separate suits were brought. A claimant could only recover extracontractual or punitive damages (for the torts of intentional infliction of emotional distress, gross negligence, fraud, or malice) if he was willing to waive his contract claim.

---

**5.** *See generally,* Freeland and Freeland, "Bad Faith Litigation: A Practical Analysis," 53 Miss. L.J. 237 (1983); W. Denton and W. Walker, *Bad Faith Litigation in Mississippi* (1981); and Hughes, *"Standard Life Insurance Company of Indiana v. Veal:* A Perspective Look at Punitive Damages in Mississippi," 1 Miss.Col.L.Rev. 21 (1978). *See also* Comment, "Insurance Bad Faith in Mississippi: The Arguable Reason, Punitive Damages and Trial Procedure," 55 Miss.L. J. 485 (1985).

Since a contract claim was easier to prove than a tort claim, most individuals opted to pursue the former. *See generally, 5 Corbin on Contracts,* §§ 1076–77 (1964 ed.); 2 F. Harper and F. James, *The Law of Torts,* §§ 18.6, 28.32 (1956 ed.)

In 1915, the Mississippi Supreme Court was faced with a case involving a peculiar breach of a contract. *Hood v. Moffett,* 109 Miss. 757, 69 So. 664 (1915). Mrs. Lena Moffett, a woman pregnant with a child, paid her physician, Dr. B.S. Hood, to attend to her at the appropriate time. When labor pains developed, a message was sent to the doctor, but he failed to arrive as requested. Mrs. Moffett's child was not born until a few days later, and she suffered no complications; nevertheless, she instituted suit a short time thereafter for actual damages, punitive damages, and damages for mental anguish. A jury awarded Mrs. Moffett damages in the amount of $150.00.

On appeal, the Mississippi Supreme Court affirmed the jury's verdict, holding that Mrs. Moffett was entitled to both actual damages arising out of the breach as well as damages for her mental anguish. The court permitted the latter in light of evidence tending to show that Mrs. Moffett had suffered "intense and prolonged physical pain" as a result of her physician's failure to attend her when requested to do so. *Id.* 69 So. at 666. The court went on to note, however, that:

> The jury should not have been instructed ... to award punitive damages. This is a suit for damages alleged to have been sustained because of the breach of a contract, and the rule is, with probably two exceptions, and within neither of which does the case at bar come, *that such damages are not recoverable in such an action unless the act or omission constituting the breach of the contract amounts also to the commission of a tort.* This error, however, was harmless, for the reason that since the amount of damages awarded is only $150, it cannot be said that the jury responded to the instruction and included

in the verdict an award for punitive damages.

*Id.* (Citations omitted.) (Emphasis added.) This statement is said to be the beginning of the journey toward developing a cause of action for bad faith refusals of legitimate insurance claims.

Notwithstanding the rule announced in *Hood, supra,* the state supreme court continued over the years to reject attempts by litigants to recover both contract and tort damages in the same suit. *See, e.g., Home Insurance Co. v. Tate Mercantile Co.,* 117 Miss. 760, 78 So. 709 (1918) (breach of fire insurance policy; attempt to recover for gross negligence rejected); *Potomac Ins. Co. v. Wilkinson,* 213 Miss. 520, 57 So.2d 158 (1952) (breach of auto insurance policy; attempt to recover for conversion rejected); *Laurel Auto Supply Co. v. Sumrall,* 184 Miss. 88, 185 So. 566 (1939) (breach of sales contract; election of contract or tort remedies required); *Lloyd Ford Co. v. Sharp,* 192 So.2d 398 (Miss.1966) (same); *Bryan Construction Co. v. Thad Ryan Cadillac, Inc.,* 300 So.2d 444 (Miss.1974) (same).

Two cases served as exceptions to this pattern, however. In *American Railway Express Co. v. Bailey,* 142 Miss. 622, 631, 107 So. 761, 763 (1926), a case involving the failure of a finance company to deliver the correct amount of money cabled to the plaintiff, the Mississippi Supreme Court explained that punitive damages could be available when the breach of contract was "attended by some intentional wrong, insult, abuse, or gross negligence, which amounts to an independent tort." The court applied this rule again in 1944 in the case of *D.L. Fair Lumber Co. v. Weems,* 196 Miss. 210, 16 So.2d 770 (1944) (agreement to repair fences breached in connection with a contract for the sale of timber; cattle lost over a period of months due to deliberate indifference of the lessee).

The legislature statutorily repealed the common law rule prohibiting joinder of claims in 1974.[6] Miss.Code Ann. § 11-7-36

---

**6.** The legislature ameliorated the prohibition against joining claims for breach of a sales contract and deceit by enacting Article 2 of the Uniform Commercial Code (UCC) in 1966. *See*

Miss.Code Ann. § 75-2-721 (1972); Miss.Code 1942 Ann., § 41A:2-721 (Supp.1967). *See generally Bryan Construction Co., Inc. v. Thad Ryan Cadillac, Inc.,* 300 So.2d 444, 447 (Miss.1974).

(Supp.1987); Miss.Laws Ch. 315, § 1 (1974). *See also* Rule 2, Miss.R.Civ.P. (1982 ed.) One year later, the decision in *Progressive Casualty Ins. Co. v. Keys*, 317 So.2d 396 (1975), was rendered wherein the court formally recognized for the first time that an insurance company could be subjected to punitive damages if the breach of contract is "attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort." *Id.* at 398 (citations omitted). *See also Lincoln National Life Ins. Co. v. Crews*, 341 So.2d 1321 (Miss.1977) (same result reached in case involving potential waiver of a policy condition).

The seminal case on bad faith in this state is *Standard Life Insurance Co. v. Veal*, 354 So.2d 239 (Miss.1977). In *Veal*, the Mississippi Supreme Court held an insurance company liable for punitive damages for failing to pay a legitimate claim. The court, in explaining why exemplary damages in the amount of $25,000.00 were being awarded in this instance for the first time, stated:

> This case demonstrates the necessity of awarding punitive damages when an insurance company refuses to pay a legitimate claim, and bases its refusal to honor the claim on a reason clearly contrary to the express provisions of its own policy.... We are of the opinion that the refusal to pay the legitimate claim in this case was an intentional wrong and constituted an independent tort as contemplated in *Progressive Casualty Insurance Company v. Keys, supra.* Of course, *if an insurance company has a legitimate or an arguable reason for failing to pay a claim, punitive damages will not lie....*

*Id.* at 248 (emphasis added).

Subsequent decisions have clarified what constitutes "legitimate or arguable reason." As Justice Robertson noted in a separate opinion in *Blue Cross and Blue Shield of Mississippi v. Campbell*, 466 So. 2d 833 (Miss.1984),

> An arguable reason is one in support of which there is some credible evidence. There may well be evidence to the contrary. A person [or insurer] is said to have an arguable reason for acting if there is some credible evidence that supports the conclusions on the basis of which he [or it] acts.

*Id.* at 851.

The Mississippi Supreme Court has also addressed the question of what conduct amounts to an independent and intentional tort.

> The absence of an arguable reason ... does not lead inexorably to an assessment of punitive damages. This is because ... the substantive test for awarding punitive damages is the same in bad faith refusal cases as in any other case where punitive damages are sought. That test requires the plaintiff to show *some willful or malicious wrong or the gross or reckless disregard for the rights of others.*

*Weems v. American Security Ins. Co.*, 486 So.2d 1222, 1226–27 (Miss.1986). Stated another way,

> To recover punitive damages from an insurer for amounts over and above policy benefits, an insured must prove *by a preponderance of the evidence* either (1) that the insurer acted with malice, or (2) that the insurer acted with gross negligence or reckless disregard for the rights of others.

*Aetna Casualty and Surety Co. v. Day*, 487 So.2d 830, 832 (Miss.1986). *See also Blue Cross and Blue Shield of Mississippi, Inc. v. Maas*, 516 So.2d 495, 498 (Miss. 1987); *Mutual Life Insurance Company of New York (MONY) v. Wesson*, 517 So.2d 521 (Miss.1987).

Punitive damages are allowed under certain circumstances in order to (1) punish the wrongdoer for engaging in egregious conduct and (2) to deter the wrongdoer and others similarly situated from committing the same acts in the future. *See Snowden v. Osborne*, 269 So.2d 858 (Miss.1972). As the court noted in *Veal, supra,*

> If an insurance company could not be subjected to punitive damages, it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impugnity. To permit an insurer to deny a legitimate claim, and thus force a claimant to litigate with no fear that claimant's maximum recovery could ex-

ceed the policy limits plus interest, would enable the insurer to pressure an insured to a point of desperation enabling the insurer to force an inadequate settlement or avoid payment entirely.

*Id.* at 248.

The Mississippi Supreme Court first affirmed an award of punitive damages against an insurer in 1977. *Standard Life Insurance Co. v. Veal, supra.* Although a number of decisions have been rendered since then which also affirmed such assessments,[7] the rules derived from these cases have often appeared inconsistent or contradictory. *Compare Bankers Life and Casualty Co. v. Crenshaw,* 483 So.2d 254 (Miss.1985), and *Reserve Life Insurance Company v. McGee,* 444 So.2d 803 (Miss. 1983), *with Blue Cross and Blue Shield of Mississippi v. Campbell,* 466 So.2d 833 (Miss.1984). *See generally* Comment, 55 Miss.L.J. 485 (1985).

Mississippi may also permit an aggrieved claimant to recover extracontractual (i.e., tort) compensatory damages if the insurer acted without an arguable reason and in bad faith. Although the state supreme court has yet to directly decide the issue, several rulings have implied that such a remedy is available. *See, e.g., Blue Cross and Blue Shield of Mississippi, Inc. v. Maas,* 516 So.2d 495 (Miss.1987) (Robertson, J., concurring, joined by a majority consisting of Lee, Prather, Anderson, Griffin, and Zuccaro, J.J.); *Pioneer Life Ins. Co. of Illinois v. Moss,* 513 So.2d 927, 931 (Miss.1987) (Robertson, J., concurring, joined by Prather and Anderson, JJ.); *Aetna Casualty and Surety Co. v. Day,* 487 So.2d 830, 835 (Miss.1986); *Bankers Life and Casualty Co. v. Crenshaw,* 483 So.2d 254, 299 n. 18 (Miss.1985) (Robertson, J., dissenting, joined by Walker, P.J., and Prather, J.); *State Farm Fire and Cas. Co. v. Simpson,* 477 So.2d 242, 253 (Miss. 1985); *Blue Cross and Blue Shield of Mississippi v. Campbell,* 466 So.2d 833, 847 (Miss.1985) (Robertson, J., specially concurring with the denial of the petition for rehearing, joined by Prather and Anderson, JJ.); *Travelers Indemnity Co. v. Wetherbee,* 368 So.2d 829, 836 (Miss.1979); *Bellefonte Insurance Co. v. Griffin,* 358 So.2d 387 (Miss.1978). *See also Tutor v. Ranger Insurance Co.,* 804 F.2d 1395 (5th Cir.1986) (applying Miss. law); *Jones v. Benefit Trust Life Ins. Co.,* 617 F.Supp. 1542, 1545–50 (S.D.Miss.1985), *reversed in relevant part,* 800 F.2d 1397 (5th Cir.1986) (same); *Davidson v. State Farm Fire and Casualty Co.,* 641 F.Supp. 503, 511 (N.D. Miss.1986) (same); *Horton v. Hartford Life Ins. Co.,* 570 F.Supp. 1120 (N.D.Miss. 1983) (same); *Peel v. American Fidelity Assurance Co.,* 680 F.2d 374, 376 (5th Cir. 1982) (same).

In *Blue Cross and Blue Shield, supra,* the court noted that "in a proper punitive damages case in this state, it has long been recognized [that] the jury may consider in making a punitive damage award, the emotional distress and even attorney's fees of the plaintiff." *Id.* at 845. Hence, even if an award of extra-contractual compensatory damages is not *per se* permissible, state law still allows the trier of fact to consider the claimant's economic and emotional losses when assessing punitive damages.[8]

---

**7.** The Mississippi Supreme Court has affirmed punitive damage assessments in the following cases: *Standard Life Insurance Co. v. Veal,* 354 So.2d 239 (Miss.1977); *Travelers Indemnity Co. v. Wetherbee,* 368 So.2d 829 (Miss.1979); *Reserve Life Insurance Co. v. McGee,* 444 So.2d 803 (Miss.1983); *Bankers Life and Casualty Co. v. Crenshaw,* 483 So.2d 254 (Miss.1985); *Southern United Life Insurance Co. v. Caves,* 481 So.2d 764 (Miss.1985); *National Life and Accident Insurance Co. v. Miller,* 484 So.2d 329 (Miss.1985); *Mississippi Farm Bureau Mutual Insurance Co. v. Todd,* 492 So.2d 919 (Miss.1986); *Blue Cross and Blue Shield of Mississippi, Inc. v. MAAS,* 516 So.2d 495 (Miss.1987); *Mutual Life Insurance Company of New York v. Wesson,* 517 So.2d 521 (Miss.1987); *Life Insurance Company of Mississippi v. Allen,* 518 So.2d 1189 (Miss.1987).

*See* Comment, 55 Miss.L.J. 485, 496 n. 55 (1985). Sitting in a diversity context, federal district courts have awarded punitive damages, or have had such awards affirmed, in the following cases: *Richards v. Allstate Insurance Co.,* 693 F.2d 502 (5th Cir.1982); *Henderson v. United States Fidelity & Guaranty Co.,* 695 F.2d 109 (5th Cir.1983) (*Henderson II*); *Jones v. Benefit Trust Life Ins. Co.,* 617 F.Supp. 1542 (S.D.Miss.1985), *affirmed in relevant part,* 800 F.2d 1397 (5th Cir.1986).

**8.** In *Maas, supra,* a majority of the Mississippi Supreme Court agreed that "[w]hether such awards [are] considered as components of economic loss tort damages, or as [separate and distinct] awards required by other law, matters not." 516 So.2d at 498.

Under certain circumstances a plaintiff may likewise be entitled to an award of attorney's fees incurred in connection with the bad faith refusal of his claim. The court in *Simpson, supra*, explained that attorney's fees are not recoverable unless the insurer's actions are so grossly or willfully wrong as to justify the infliction of punitive damages. *Id.* at 253. *See also Harrison v. Benefit Trust Life Insurance Co.*, 656 F.Supp. 304, 309 (N.D.Miss.1987).[9] Thus, if a claimant shows that he or she is entitled to punitive damages, then an award of attorney's fees may be appropriate as well.[10]

The final component of any recovery is an award of prejudgment interest. Absent a statutory provision, prejudgment interest is allowable at the court's discretion if (a) the claim is for a liquidated amount or (b) the refusal to pay is accompanied by bad faith conduct sufficient to support an award of punitive damages. *Bankers Life and Casualty Co. v. Crenshaw*, 483 So.2d 254, 300 (Miss.1985) (Robertson, J., dissenting); *Stanton and Associates, Inc. v. Bryant Construction Co., Inc.*, 464 So.2d 499, 502 (Miss.1985); *Dunnam v. State Farm Mutual Automobile Insurance Co.*,

366 So.2d 668, 672 (Miss.1979); *Home Insurance Co. v. Olmstead*, 355 So.2d 310, 314 (Miss.1978). *See also Cabell Electric Co. v. Pacific Insurance Co.*, 655 F.Supp. 625, 630–31 (S.D.Miss.1987).

If an insurance company denies a claim, it may be liable for prejudgment interest since the amount in most cases is liquidated. *See, e.g., Davis v. Continental Casualty Co.*, 560 F.Supp. 723, 730 (N.D. Miss.1983); *Western Line Consol. Sch. Dist. v. Continental Casualty Co.*, 632 F.Supp. 295 (N.D.Miss.1986). Even if the underlying contract claim is paid prior to trial, the insurer may be liable for prejudgment interest on the amount from the time the claim reasonably should have been paid[11] and the time it actually was paid. If, as in the case *sub judice*, the plaintiff proceeds to trial seeking extracontractual and punitive damages, the insurer may find itself assessed with prejudgment interest on the unliquidated claims if the element of bad faith is present. In other words, by proving an entitlement to punitive damages, a plaintiff opens up the possibility of getting prejudgment interest; this exposure is not necessarily mitigated by the insurer's decision to pay off the claim in an

---

**9.** In an opinion written by Judge Biggers, this court in *Harrison* observed that "attorney's fees should be allowed in insurance contract actions for an insurer's wrongful denial of a claim, *independent* of any bad faith allegation." 656 F.Supp. at 309 (emphasis added). *See also Donahoo v. State Farm Mutual Automobile Ins. Co.*, No. GC86–18–NB–O (N.D.Miss.1987) (unpublished opinion). Over the years, Justice Robertson has attempted to persuade a majority of his brethren on the Mississippi Supreme Court to either provide attorney's fees to claimants who have prevailed on their contract claim, or establish an intermediate level of conduct which would entitle a claimant to relief short of punitive damages. *See Blue Cross and Blue Shield of Mississippi v. Campbell*, 466 So.2d 833, 847 (Miss.1984); *Bankers Life and Casualty Co. v. Crenshaw*, 483 So.2d 254, 299 n. 18 (Miss.1985). The wisdom in Robertson's approach is apparent.

An alternative approach has also been suggested by Judge Hawkins. *See Reserve Life Insurance Co. v. McGee*, 444 So.2d 803, 819 (Miss.1983) (Hawkins, J., dissenting) (noting that legislative action might be appropriate to limit recovery in insurance cases to "actual expenses [incurred]

in bringing suit plus double or triple the sum found to be due under the policy)."

**10.** As noted previously, the court in *Blue Cross and Blue Shield, supra*, intimated that a plaintiff could recover attorney's fees (and extracontractual damages) within the context of an award for punitive damages. Although this distinction appears to be in conflict with the definition of punitive damages (which are designed to punish, not compensate), the court deems this to be irrelevant to the result reached herein. *Cf. Maas, supra*, at 498. Predictably, the adoption of a statute or rule creating a right to attorney's fees, etc., will cause a concomitant decrease in the rising rate of "bad faith" litigation confronting the courts.

**11.** As Justice Robertson indicated in his dissent in *Crenshaw*, "The insurer, of course, is entitled to a reasonable period of time within which to investigate and process a claim. This is wholly consistent with the insurer's duty to pay with reasonable promptness. I would hold that prejudgment interest on all first party insurance claims should begin to run thirty days following the insurer's receipt of the proof of claim, unless the equities of a given case clearly indicate

untimely fashion prior to trial.[12]

## B. An Insurer's Duty to Adequately Investigate a Claim Prior to Denying It

The mere fact that an investigation of a claim is deficient or incompetent is not sufficient to render the insurance company liable for punitive damages. *Fedders Corp. v. Boatright*, 493 So.2d 301, 312 (Miss.1986); *Bellefonte Insurance Co. v. Griffin*, 358 So.2d 387, 391 (Miss.1978). This is true even where an underwriter could have done more, *O'Connor v. Equitable Life Assurance Society of the United States*, 592 F.Supp. 595, 598 (N.D. Miss.1984), or where clerical mistakes resulted in a negligent denial of a claim. *Consolidated American Life Insurance Co. v. Toche*, 410 So.2d 1303, 1306 (Miss. 1982).

Nevertheless, Mississippi law imposes a clear duty upon an insurance company to promptly[13] and adequately investigate an insured's claim before denying it. An insurance company must, at a minimum, (1) check to see if the policy provision relied upon to deny the claim has been held invalid and unenforceable by a state or federal court, *see Employers Mutual Casualty Co. v. Tompkins*, 490 So.2d 897 (Miss. 1986); *see also Richards v. Allstate Insurance Co.*, 693 F.2d 502 (5th Cir.1982) (applying Mississippi law); (2) interview its employees and agents to ascertain if they possess any relevant knowledge regarding the claim in question, *see Merchants National Bank v. Southeastern Fire Insurance Co.*, 751 F.2d 771 (5th Cir.1985) (applying Mississippi law), and (3) if the claim is related to the plaintiff's health, then make reasonable efforts to obtain all available medical information relevant to the claim, *see Life Insurance Co. of Mississippi v. Allen*, 518 So.2d 1189 (Miss.1987); *Bankers Life and Casualty Co. v. Crenshaw*, 483 So.2d 254, 271–73 (Miss.1985); *Blue Cross and Blue Shield of Mississippi v. Campbell*, 466 So.2d 833 (Miss.1984); *Reserve Life Insurance Co. v. McGee*, 444 So.2d 803 (Miss.1983).

What constitutes a "reasonable effort" to obtain "all available medical information?" This question has been, and will continue to be, decided on a case-by-case basis. A review of the relevant case law is, therefore, instructive.

### Reserve Life v. McGee

In September of 1980, Henry McGee was admitted to a hospital for urinary tract problems. After an examination revealed a lesion on McGee's bladder, doctors operated and removed the lesion and released McGee nine days later. Medical analysis determined that the lesion had a short existence prior to its removal.

In December of 1980, McGee was again hospitalized for an inflamed bladder. No evidence of lesion recurrence was found, and treatment of the inflammatory condition was successful. McGee was discharged five days later.

McGee had purchased his medical and hospitalization insurance from a Reserve Life agent in early 1980. Although McGee submitted the proper loss forms to Reserve Life after his September and December hospitalizations, by January 21, 1981, he

that the commencement date should be later." 483 So.2d at 300–01.

**12.** As always, the court is mindful of its role under *Erie.* To the extent that the Mississippi Supreme Court has remained silent on the issue of prejudgment interest, the statements contained herein represent merely an *"Erie*–guess" as to what the high court would do if presented with the question. This approach is followed throughout this opinion in all areas where guidance has not been forthcoming or the law unambiguously stated.

**13.** Mere delay in investigating a claim will not support an award of punitive damages under Mississippi law unless it is (a) so unreasonable as to constitute an independent tort or (b) amounts to a constructive denial of the claim, made without an arguable reason and in bad faith. *Tutor v. Ranger Insurance Co.,* 804 F.2d 1395, 1398–99 (5th Cir.1986) (applying Miss. law); *Aetna Casualty and Surety Co. v. Day,* 487 So.2d 830, 833 (Miss.1986). *See also Reece v. State Farm Fire and Casualty Co.,* No. EC85–433–D–D (N.D.Miss.1987) (unpublished supplemental opinion dated Dec. 22, 1987). Most insurance companies, including Reserve Life, have enacted internal policy guidelines which give the insured a right to a prompt and objective investigation of his or her claim.

found his claims remained unpaid because "his files were incomplete" and Reserve Life's investigation was still pending. On February 12, 1981, Reserve Life formally denied the claim on the grounds that material misrepresentations made by McGee entitled it to void the policy *ab initio*.

The trial was held in November of 1981. McGee received a jury verdict of $2,416.00 in contract damages and $158,000.00 in punitive damages. By rendering such a verdict, the jury necessarily found that (1) the misrepresentations, if any, were not material to the issuance of the policy, (2) the denial was contrary to the terms of the policy, (3) Reserve Life intentionally denied McGee's claims, (4) Reserve Life did not have a legitimate or arguable reason to support its denial, (5) the actions of Reserve Life were wanton, malicious, grossly negligent, or evidenced reckless disregard for McGee's rights, (6) McGee should have received, pursuant to the policy provisions, $2,416.00 for his medical expenses, and (7) an assessment of $158,000 would serve to punish Reserve Life for its actions and deter it and others from repeating such conduct in the future.[14]

On appeal, the Mississippi Supreme Court affirmed. Chief among the appellate court's considerations were the trial court observations that (a) McGee was an uneducated man, easily led and imposed upon, (b) a "glib talking salesman" with a substantial commission to be earned "talked through" the application with McGee, asking all the questions, while in McGee's own home, (c) Dr. Edgar Bobo was McGee's personal physician at the time the application was filled out, and this fact was made known to Reserve Life, (d) Reserve Life was given permission to communicate with Dr. Bobo and to obtain all relevant data concerning his prior medical history, (e) simple communications with Dr. Bobo would have revealed any prior transient ischemic attacks which were alleged to be the basis of the misrepresentation in question, (f) the prior transient ischemic attacks had nothing to do with plaintiff's bladder cancer for which benefits were claimed un-

der the policy, (g) notwithstanding the receipt of written permission, Reserve Life wrote the policy without communicating in any way with Dr. Bobo, (h) any misrepresentations by McGee were innocent ones, (i) Reserve Life waited until a claim was filed but then utilized its permission to conduct an intensive investigation of McGee's prior medical history, and (j) Reserve Life received and kept monthly premiums for five months after the claims were made before rejecting them. 444 So.2d at 811. The court also noted that the trial judge had commented as follows:

> Hospital and medical insurance is absolutely essential in this era of astronomical medical costs. [McGee] cannot now obtain such insurance. Quite likely he could have obtained such insurance at an increased premium at the time the application was made and the time Reserve Life evaluated this risk, even if the transient ischemic attacks came into light. To allow Reserve Life to "sandbag" and gloss over its investigation of [McGee's] medical history at the time of evaluating the underwriting risk, then comb intensively for five months his prior records after a claim is made "looking for a defense" (even based on a condition unrelated to his benefit claim) and then deny coverage "in good faith" is to invite manifest abuse of the public in such relationships. Under such circumstances punitive damage awards provide the public with its best protection from such abuse of this relationship between insured and insurer.

*Id.*

Justice Robertson amplified upon the trial judge's concerns in a separate concurring opinion.

> At the time of the application, McGee disclosed the name of [his personal treating physician]. He also executed the proper form authorizing [his doctor] to release to Reserve any information requested by Reserve. I would hold that, as a matter of law, *where an insured does this in his application for insur-*

14. Later in this opinion, I note the failure of this case to "deter such conduct in the future." Indeed, the *manager* of the claim department of

Reserve Life was not even familiar with the facts forming the basis for the punitive damage award in *McGee.*

ance, the insurance company is charged with knowledge of all information in the doctor's records and everything the doctor may personally have remembered about the applicant.

\*    \*    \*    \*    \*    \*

*I would hold that, at the time it accepted the risk and issued the policy in question, Reserve is deemed to have known what its later investigation [via] McGee's doctor] revealed.*

It seems to me that insurance companies ought to be happy with this approach. By checking with prior treating physicians, they can obtain accurate medical history of an insurance applicant. Few laymen are able to describe fully their medical history. This is particularly so in the case of one like Mr. McGee who has only a third grade education. McGee's disclosure of his prior relationship with [his doctor] gave Reserve access to better information than it would have had if McGee had stumbled through his personal recollections of his medical history.

*Id.* at 816 (emphasis added).

Although *Reserve Life v. McGee* deals with a material misrepresentation defense and is, therefore, factually distinguishable from the case at bar, the same concerns which prompted the above-quoted comments are present here as well.

When Reserve Life received Ms. Eichenseer's claim, it was faced with an insured who had basic schooling, but was unsophisticated with respect to insurance matters. Although she personally attempted to comply with the demands of the defendant, Ms. Eichenseer found herself overwhelmed and, of course, unpaid. It was only through the efforts of her attorney that the contract portion of her claim was eventually paid.

Finally, the court notes that Reserve Life's initial investigation of Eichenseer's claim took four months, and it continued to reevaluate its position through trial. In *McGee*, the investigation took five months.

## Blue Cross and Blue Shield v. Campbell

William T. Campbell applied for hospitalization insurance from Blue Cross on October 2, 1980. On October 16, 1980, Blue Cross accepted Campbell's application and issued him a policy as requested.

In filling out the application, Campbell stated he had never been treated for alcoholism or ulcers. On the face of the application, coverage for "care or treatment during the first twelve months after the effective date of the contract" was excluded if it was the result of "causes existing prior to the effective date of the contract." . . .

On December 3, 1980, six weeks after the policy became effective, Campbell was admitted to a Greenville hospital for acute alcoholic pancreatitis. Total charges amounted to $8,210.87, with roughly one-half thereof related to drug charges. One of the drugs administered during Campbell's stay was Halchol, a sedative often prescribed for patients suffering from alcohol withdrawal.

Upon receipt of Campbell's claim, Blue Cross immediately turned the matter over to its medical staff. In February and again in March of 1981, staff members twice requested that the hospital send Campbell's medical history, physician, and discharge summary to Blue Cross for review. After receiving the discharge summary, the insurer denied Campbell's claim based upon statements in his discharge summary which indicated that his hospitalization might have been caused by a preexisting drinking condition.

Campbell was again hospitalized on April 28, 1981, for "acute pancreatitis, acute gastritis, a urinary tract infection, and a possible duodenal ulcer, active." Campbell was discharged on May 11, 1981, but not before accumulating additional charges amount to $2,823.28.

On May 21, 1981, Blue Cross received another copy of Campbell's claim for his first hospitalization. Although it was the same in all material respects, a barely discernible line appeared to be drawn through, or at the bottom of, the diagnosis "acute

alcoholic" and further typed over it a new diagnosis, "acute pancreatitis." The notation "CORRECTIVE BILLING/Wrong Diagnosis Submitted" appeared across the face of the copy in someone's handwriting.

Blue Cross declined to reverse its decision to deny benefits for the first hospitalization based on the failure of hospital officials to formally correct the official hospital records.

Campbell was hospitalized a third time, from June 16, 1981, to June 22, 1981, for continued treatment of his pancreatitis and ulcer. The total charge for this visit was $1,514.50. Although the final diagnosis for this hospitalization was listed as "acute pancreatitis, small duodenal ulcer," "alcohol abuse" was listed under the headings of "secondary diagnosis" or "complications."

In July of 1981, Campbell hired an attorney in an attempt to resolve the matter. After receiving a letter from Campbell's attorney and reviewing an accompanying note from a hospital physician, Blue Cross paid the three hospitalization bills. Campbell's attorney, however, deemed this attempt at satisfaction to be insufficient and demanded an additional sum of roughly $3,000.00 for extracontractual expenses incurred in connection with attempting to collect benefits. Blue Cross denied this request, and suit was commenced in October of 1981.

The trial of Campbell's claim was conducted on November 19, 1982. The jury returned a verdict in Campbell's favor for $10,000.00 actual damages, but denied the claim for punitive damages.

On appeal, the Mississippi Supreme Court reversed the jury's verdict as to contractual damages and rendered a verdict in favor of Blue Cross. In affirming the decision not to grant punitive damages, the court stated:

> Why should Blue Cross be faulted for rejecting this claim? If a hospital wants to be paid for a claim in which its own hospital records cast a serious doubt, *the hospital* should take the appropriate steps to see that Blue Cross is furnished with records or reputable medical opinion that the hospitalization was not *for* or a *result* of any ailment or disease or physical condition existing at or before the inception of a six-week-old insurance policy.
>
> The uncontradicted testimony in this case is that the Blue Cross *medical staff* reviewed this claim and came to the conclusion, from the *records submitted,* this claim was excluded under the policy. Where is there any proof they acted arbitrarily or with caprice.

466 So.2d at 840 (emphasis added.)

Although the court appears to place a duty on the hospital in insurance cases to submit complete and unambiguous records, the key distinction in the facts recited above is that Blue Cross immediately referred Campbell's claim to qualified medical officials (a licensed physician and five registered nurses) for review. Blue Cross's decision to deny a claim based on a preexisting illness was supported by both competent medical opinion and ambiguous hospital records.

By contrast, the court notes that Reserve Life failed to obtain a medical opinion in the case at bar until after suit was commenced.

### Bankers Life v. Crenshaw

Lloyd M. Crenshaw, a 61–year–old white male, injured his right foot on January 6, 1979, while working on a carburetor in his garage. Two days later, still suffering pain, Crenshaw went to a hospital emergency room for treatment. He was given medications and told to stay off his feet as much as possible.

Crenshaw's pain increased significantly over the next two days. During a second visit to the hospital, x-rays were taken, a blood test was administered, a splint was put on his leg, and Crenshaw was given crutches. Two more visits followed, to the same effect.

On Sunday, January 14, 1979, Crenshaw was admitted to the hospital and reexamined. By this time, his foot was swollen, with red streaks progressing up his leg, and his toes were blue. Pulses were not palpable, and a white blood cell count was elevated.

On January 18, 1979, Crenshaw was admitted to surgery and had his right leg amputated below the knee. The final diagnosis, reflected in the hospital records, showed (1) anterior compartment syndrome, right leg, and (2) ischemic of the right leg.

On April 9, 1979, Crenshaw submitted his claim to Bankers Life along with a medical authorization for the insurance company to obtain all medical information it needed from any physician or hospital. The narrative summary, operation report, and the pathology report were also attached to this claim.

Bankers Life concluded its investigation in July of 1979. In September, 1979, Crenshaw was informed that his claim was denied due to the presence of a preexisting condition (severe arteriosclerosis of the lower right leg). Although Crenshaw continued to seek a reversal of this decision, informal efforts were unsuccessful. On November 10, 1980, Crenshaw filed suit seeking contractual and punitive damages.

After a trial in December, 1981, a jury returned a verdict in Crenshaw's favor in the amount of $20,000.00 actual damages and $1,600,000.00 punitive damages. In affirming the jury's decision, the Mississippi Supreme Court rejected an absolute rule that reliance upon a medical opinion obtained in good faith provided an insurer with an arguable reason for denial of a claim as a matter of law.

Testimony at trial indicated that Bankers Life referred Crenshaw's claim to its in-house medical director, Dr. Nathaniel P. McParland, for initial review. Prior to the denial, Dr. McParland opined that Crenshaw's leg amputation was unrelated to his recent foot trauma. This diagnosis was based upon a review of Crenshaw's medical records. Dr. McParland did not examine Crenshaw personally nor did he contact his treating physician, Dr. Christopher T. Westphal.

Dr. Westphal testified that Crenshaw's leg amputation was caused by preexisting circulatory problems in his leg which were exacerbated by the January 6, 1979, trauma. Dr. Westphal also was of the opinion that

while the documents seen by Dr. McParland would give a general idea as to what was wrong with [Crenshaw] and what had happened to him, they were not sufficiently accurate to make many judgments concerning [his condition]. The physician needed to go specifically to the entire medical records, not simply the summary. The pathology report was insufficient ... and also inaccurate as to the location of the amputation. There was also a discrepancy in the pathologist's finding upon a visual inspection of the blood vessels as normal, while the microscopic diagnosis revealed severe atherosclerosis of arteries and gangrenous necrosis.... [S]ome clinical observation should have supported the microscopic diagnosis.

483 So.2d at 266.

In addition to Dr. Westphal, Crenshaw also called a second licensed physician, Dr. Perry T. Hockaday, to testify in his behalf. Dr. Hockaday concurred with Dr. Westphal's opinion that Crenshaw's amputation was a result of his foot injury. He likewise agreed with Dr. Westphal in noting the incomplete nature of Dr. McParland's records; neither the emergency room report nor the admitting examination report of January 14, 1979, were viewed by Dr. McParland before he rendered his opinion.

In making a determination of whether there was an arterial occlusion independent of any trauma or whether trauma played some part in the problem, Dr. Hockaday testified the entire medical record needed to be examined, not just portions of it as seen by Dr. McParland. Of utmost importance to Dr. Hockaday was the emergency room report, which documented an injury of some type to Crenshaw, distinguishing him from someone who simply came in off the street with a need to have his leg amputated.

483 So.2d at 265.

The Mississippi Supreme Court affirmed the jury's award of punitive damages, noting that Bankers Life claims officials failed to (a) interview the attending physician personally, (b) obtain a photocopy of the physi-

cian's records, (c) obtain photocopies of complete hospital records, including EKG reports, and (d) interview the insured (Crenshaw). The court stated:

There was no interview of Crenshaw, no interview of any of his doctors, and no request for medical records. Instead, relying on the three medical entries Crenshaw sent with his claim, his claim was denied. There is no dispute that these medical documents did not tell the complete story of Crenshaw's problems. It is also clear to this court that what Crenshaw did send was sufficient to *either justify payment of his claim, or at least require Bankers Life to make a full and thorough investigation, interview Crenshaw and his family, look at all of his medical records, and interview his doctors before his claim was denied.*

483 So.2d at 270 (emphasis added). As an alternative basis for its decision,[15] the court noted that Bankers Life denied Crenshaw's claim in reliance upon an invalid policy provision; this was likewise deemed sufficient to support an award of punitive damages.

*Bankers Life* is the case most analagous to the one at bar. Reserve Life received an incomplete set of medical records, failed to interview either the plaintiff or her doctors, and declined to submit the matter to inhouse medical personnel for review. Like Bankers Life officials, Reserve Life employees told the plaintiff that if she had any further information she could submit it for review. In both cases, the insurer assumed "no responsibility [for] checking the facts further...." 483 So.2d at 273.

### Life Insurance Company of Mississippi v. Allen

Isom D. (Buddy) Allen purchased a 1977 Chevrolet Corvette from a used car dealer in August of 1981. Included in the install-ment sale contract was a requirement that Allen purchase credit disability insurance from the Life Insurance Company of Mississippi (hereinafter referred to as Life of Mississippi).[16] Allen paid an initial premium of $355.88 plus interest and was immediately insured.

The terms of the Life of Mississippi policy expressly excluded coverage for any loss caused by a condition or illness which existed prior to the effective date of the policy, August 17, 1981. Allen had previously broken his collarbone in mid–1980, but had reached maximum medical recovery sometime between December, 1980, and November 1981, according to the testimony of his treating physician, Dr. J. Elmer Nix. Allen also pulled a muscle in his left arm and shoulder sometime after purchasing the Life of Mississippi policy, but was absent from work for only one week. Both the 1980 collarbone injury and the 1981 muscle pull had completely healed by early 1982.

On February 9, 1982, Allen suffered a separated shoulder while working on an oil rig. He underwent surgery one month later and remained disabled for six months thereafter. Allen submitted a claim to Life of Mississippi on March 31, 1982, and subsequently filed four more claims during the following months. Life of Mississippi claims adjuster Jeannie Covey denied Allen's claims on the ground that his injury was related to his 1980 injury, which was a preexisting condition not covered by the policy. Significantly, Covey based her opinion solely upon her personal interpretation of Allen's medical records. Covey never contacted Allen's physician or any other medical authority prior to denying his claim.

Suit was commenced by Allen on September 8, 1982. The case went to trial in

---

**15.** Some commentators have implied that the holding in *Bankers Life* may only be harmonized with *Blue Cross* if it is viewed as an "invalid policy provision" case rather than a "preexisting condition/reliance on medical opinion" case. *See, e.g.,* Comment, 55 Miss.L.F. 485, 497 n. 57 (1985). Although this approach is tempting, this court shall continue to interpret *Bankers Life* as it presently stands. Bankers Life officials may have in fact relief on a policy provision invali-

dated in *Peerless Insurance Co. v. Myers,* 192 So.2d 437 (Miss.1966), but this is open to legitimate dispute. *Cf. Bankers Life,* 483 So.2d at 291 (Robertson, J., dissenting).

**16.** Life Insurance Company of Mississippi merged with the Sunbelt Life Insurance Company on January 1, 1982, and the former assumed all contracts, assets, and liabilities of the latter. *Allen, supra,* at 1191, n. 2.

September of 1983, and the jury awarded Allen a verdict for $2,410.04 in contract damages and $20,000.00 in punitive damages. A remittitur of the punitive damage award was later ordered by the trial court, reducing the assessment to $10,000.00.

On appeal, the Mississippi Supreme Court reversed the remittitur and affirmed the jury's original award. Noting that the $20,000.00 figure was "considerably more modest than many [it had] reviewed in recent years," the court found that the record amply supported a finding that Life of Mississippi's actions were "grossly neglectful." The court explained its decision as follows:

> Making Life of Mississippi's conduct more egregious, claims adjuster Covey didn't even bother to check with Dr. Nix or any other physician before denying the claim. This could have been done with a simple phone call or letter.

518 So.2d at 1193. The court further noted that the jury may have chosen to disregard Covey's protestations to the contrary and find that "when Allen attempted to call [her] and discuss the matter, she hung up on him and refused to talk." *Id.*

The facts in *Allen* closely parallel those in the case *sub judice.* Both cases involve denials based on preexisting conditions which were unsupported by competent medical authority. Moreover, in each case, the insured was faced with a company official who was less than responsive to his or her inquiries.

In view of the decisions in *Allen, Reserve Life, Blue Cross,* and *Bankers Life,* it is difficult to conceive how Reserve Life can justify its actions. A "reasonable effort" to obtain "all available medical information" was not made in the instant case. The actions of Reserve Life, when considered as a whole, amounted to gross negligence and reckless disregard for the rights of its insured. An arguable reason to deny Ms. Eichenseer's claim did not exist at any relevant point in time.

## C. An Insurer's Ongoing Duty To Reevaluate Its Position

An insurance company is under a continuing duty to reevaluate its position when it chooses to deny a claim. This is because an insurer may be subject to punitive damages for initially denying a claim without an arguable reason, even if it later decides to pay.

A court must look to the reason an insurance company gives to an insured for denying the claim; the issue is not the defense which the insurer settles on at trial to defend the suit. *Bankers Life,* 483 So.2d at 273. This is harmonious with the corollary, under Mississippi law, that an entitlement to contractual damages is a prerequisite to receiving an award of punitive damages.

In the case *sub judice,* Reserve Life would have been justified in delaying a final decision on plaintiff's claim if it had used the additional time to further investigate her prior medical history and the facts surrounding her hospitalization. Although the initial denial of her claim on June 2, 1983, may have been the result of mere negligence, the decision to repeatedly deny her claim until after suit was filed is the result of more than simple negligence. Had Reserve Life reevaluated its position earlier and paid plaintiff's claim, a punitive damage award might not have been appropriate.

## D. Calculating an Award of Punitive Damages Under Mississippi Law

Once it is established that punitive damages in some amount should be allowed, the quantum thereof is determined by reference to the following objectives: (a) punishing the wrongdoer for his actions, (b) deterring the wrongdoer from engaging in such conduct in the future, (c) deterring others from engaging in such conduct in the future by making an "example" out of the wrongdoer, and (d) rewarding the injured party for bringing suit, thereby protecting the public from future wrongdoing. Factors to be considered in arriving at a final amount include, *inter alia,* the degree of the offense, the presence or absence of malice, the motive behind the actions, the injury intended, and the public sense of justice and propriety. Although a wrongdoer's financial net worth is important,

whether he has been sued for punitive damages before is likewise relevant. *See generally Mutual Life Insurance Company of New York v. Wesson, supra; Blue Cross and Blue Shield v. Maas, supra,* at 496–497; *Bankers Life and Casualty Co. v. Crenshaw, supra.*

■ In the case *sub judice*, organizational mismanagement and lack of adequate supervision over claims personnel resulted in a wrongful denial of plaintiff's claim. The recent installation of a computer system may have resolved a lot of the defendant's problems, but the egregious wrong committed in this case remains.

Legal research by both the court and the parties reveals only one prior instance where Reserve Life was assessed punitive damages in this state. In *Reserve Life Insurance Company v. McGee, supra,* the insurer was assessed a total of $158,000.00. Importantly, Jerry Jenkins, the manager of the major medical unit of Reserve Life's claims department, admitted during cross-examination that he had heard of the *McGee* case, but was not familiar with it. Jenkins has been with Reserve Life's claims department for twenty-one years and was with the company when the *McGee* decision was handed down in 1983. Obviously, the punitive award in *Reserve Life v. McGee* did not get the attention of Reserve Life and had little, if any, deterrent effect.

As noted before, Reserve Life expressed regret at trial for its decision to pay plaintiff's claim. Moreover, the amount actually tendered did not include interest for the three year period of delay.

A finding of malice on Reserve Life's part is not supported by the record. Nevertheless, the motive behind the insurer's actions was clear; it intended to save money by denying a claim. The injury clearly foreseeable, if not intended, was the impairment of plaintiff's ability to manage her affairs. If an insurer uses its superior position to wrongfully deny a claim under a policy, the public sense of justice is offended.

Much has been said concerning the propriety of awarding punitive damages in insurance cases. Juries in the state started awarding relative conservative amounts in the late seventies, but recent awards have exceeded a million dollars. This trend corresponds with the growing net worth of some insurance companies and the fact that many companies have never been subject to an award of punitive damages in this state.

Reason and logic must govern the calculation of any punitive damage award. In the instant case, Reserve Life has tendered a financial statement listing its net worth at roughly $157,000,000.00. The plaintiff has chosen not to challenge this figure.

Based on the circumstances of this case, the court finds that the plaintiff is entitled to an award of punitive damages in the amount of $500,000.00. This figure is roughly three times that awarded in *McGee*, but substantially less than the awards affirmed in *Wesson* and *Crenshaw*. The objectives of punishment and deterrence are served, and the plaintiff is amply rewarded for bringing a wrongdoer to account. The court is confident that this award will get the attention of Reserve Life and other insurance company officials.

### Extracontractual Compensatory Damages

■ On direct examination, plaintiff stated that she suffered emotional distress as a result of the attempts by collection agencies to get her to pay her hospital bills. Plaintiff's credit rating was adversely impaired by Reserve Life's denial, and her employer viewed the telephone calls at work and her reduced production with disfavor.

The court is of the opinion that an award of $1,000.00 will adequately compensate the plaintiff for her emotional distress and foreseeable economic losses.

### Attorney's Fees and Prejudgment Interest

Plaintiff does not specifically request attorney's fees or prejudgment interest. Assuming *arguendo* that the court is vested with the authority to award such damages in the absence of a request, the court in this instance declines to make an award of this type. The substantial assessment of

punitive damages herein militates against reimbursing the plaintiff for costs incurred in bringing this action and the loss resulting from Reserve Life's delay in paying her liquidated claim. This will not be the rule in all bad faith cases, but the court here refuses to exercise its discretion since the parties have failed to specifically address the question.

### Conclusion

To summarize, the court finds that Reserve Life acted without a legitimate or arguable reason when it denied plaintiff's claim and that such a denial amounted to gross negligence or reckless disregard for the rights of its insured. The plaintiff shall recover $500,000.00 in punitive damages and $1,000.00 in extracontractual compensatory damages for an overall total award of $501,000.00.

An order shall issue in conformity with this opinion.